UNITED STATES FIDELITY AND GUARANTY COMPANY, a corporation, Appellee,

v.

T. W. "Tony" SIDWELL, Appellant.

LIBERTY MECHANICAL & ELECTRICAL CONTRACTORS, INC., Appellant.

MAXWELL SHEET METAL CONTRACTORS, INC., a corporation, et al., Defendants.

Nos. 74–1794, 74–1795.

United States Court of Appeals, Tenth Circuit.

July 24, 1975.

Rehearing Denied Aug. 20, 1975.

Kent F. Frates, Oklahoma City, Okl., for appellant T. W "Tony" Sidwell.

John B. Estes, Oklahoma City, Okl., for appellant Liberty Mechanical & Electrical Contractors, Inc.

Robert J. Petrick, Oklahoma City, Okl., for appellee United States Fidelity and Guaranty Co.

Before CLARK *, Retired Associate Justice, and HILL and BARRETT, Circuit Judges.

CLARK, Retired Associate Justice.

This appeal is the aftermath of a controversy between the several contractors, as well as the bonding company, arising out of the construction of three grade school buildings for School District No. 8 in Comanche County, Oklahoma. The prime contract for the construction work was awarded to Buckner and Moore. It subcontracted the mechanical work to J. C. Hester Co., Inc. (Hester) and the latter subcontracted the sheet metal work to the Maxwell Sheet Metal Contractors, Inc. (Maxwell), whose surety on its payment and performance bond was United States Fidelity and Guaranty Company (USF&G). On August 8, 1973, Maxwell and Universal Dynamic and Scientific Engineering, Inc. (UDS) assigned the Maxwell Sheet Metal contract to Liberty Mechanical and Electrical Contractors, Inc. (Liberty) and the latter proceeded to complete that work. However, Maxwell had already performed a large part of the installation and had incurred some material supply debts thereon which it had not paid. USF&G was called upon to pay these material suppliers and, after August 8, 1973, paid the same in the sum of $20,871.45 and then filed this suit upon those claims against Liberty, Maxwell, UDS and T. W. (Tony) Sidwell.[1]

In the meanwhile, the School District had paid the prime contractor, Buckner and Moore, in full of its contract and the latter interpled in this suit paying $20,-602.00 into the registry of the court as

---

* Supreme Court of the United States, sitting by designation.

1. USF&G is a Maryland corporation; the remaining parties are all residents of Oklahoma; the suit is, therefore, properly laid under the diversity jurisdiction of the District Court.

the proceeds of the prime contract then remaining. USF&G then made claims to this fund by virtue of its subrogation rights under the liens of the unpaid material suppliers of Maxwell; but Liberty also claimed the fund and filed a cross claim, including a plea, against T. W. (Tony) Sidwell alleging that in the event USF&G prevailed with reference to the funds paid into court that Sidwell was liable to it by reason of his wrongfully appropriating funds that Liberty paid soon after the time it was assigned the Maxwell subcontract for the express purpose of paying the materialmen's claims. Sidwell was the managing corporate officer and director of Maxwell as well as UDS. Liberty's claim against Sidwell was based on Oklahoma Statutory law. On trial before the court without a jury USF&G was held to be entitled to the funds paid into court, less a fee of $608.00 paid to Ralph Newcombe for the filing of the interpleader, and a judgment against Liberty, Sidwell, Maxwell and UDC, jointly and severally, was entered for USF&G in the sum of $20,-602.00. Judgment for Liberty was entered against Sidwell and by default against Maxwell and UDS for $20,602.00, jointly and severally.

Liberty raises several questions of law, including (1) that the claim of USF&G was not lienable under Oklahoma law; (2) that its plea of estoppel as to USF&G should have been sustained; and (3) that the fee to Newcombe should not have been paid from the funds in the registry of the court. As to Sidwell, Liberty claims that his appeal is untimely, while Sidwell asserts that Liberty neither pled nor proved fraud in the trial court and, therefore, cannot raise it here. In addition, Sidwell says that he was not liable to Liberty as a trustee.

We have concluded that the trial judge was correct in his appraisal of the case and, after careful consideration of the record and of the points and authorities submitted, affirm the judgment.

1. It was stipulated at trial that USF&G paid the material suppliers the sum of $20,871.45 after demand was made upon it. There can be no question but that under Oklahoma Law, USF&G is subrogated to the rights of the materialmen. The recent case of *Mid-Continent Casualty Company v. First National Bank & Trust Company of Chickasha,* 531 P.2d 1370 (Okl.1975), specifically holds that a surety on the bond of a public contractor "has an equity, under the doctrine of subrogation, in money retained . . ." by reason of the contract, "for the payment of laborers and materialmen." At p. 1374. Also see *Fidelity National Bank of Oklahoma City v. United States Casualty Company,* 191 Okl. 496, 131 P.2d 75 (1942). The cases cited by Liberty are inapposite. They are based on the proposition that liens do not lie against public property because "the seizure and sale of such property would interrupt and suspend the functions of government and would therefore be against public policy." *Hutchinson v. Krueger,* 34 Okl. 23, 124 P. 591, 592 (1912). But USF&G makes no claim to any lien on public property. It merely seeks a prior right to the proceeds of a contract which have been paid to the general contractor by the School District. Furthermore, the USF&G also claims under 42 Okla.Stat. 152, as a subrogee. Here the District Court found that the claims of the materialmen were lienable under Section 152 and, as such, the proceeds held in trust by Buckner & Moore were held for the benefit of USF&G. We agree.

Nor is there any merit to Liberty's claim that in ordering the funds in the registry of the court to be paid to USF&G that the court was entering an award of damages against Liberty. We believe that the court properly invoked its equity jurisdiction in rendering a declaratory judgment and in granting a money judgment where the funds have been paid into court for the specific purpose of determining who among the various claimants are entitled to the same. In so doing, the court renders a complete adjudication of the matter and the funds then before it by finding who is entitled to the funds and then ordering them paid accordingly. To hold otherwise

would be to frustrate the very purpose of Congress in enacting the Declaratory Judgment Act.

■ 2. Nor do we find any merit to Liberty's claim of estoppel. It seems to argue that USF&G stood by and permitted it to complete the work under the Maxwell subcontract without advising that USF&G intended to and later had paid the materialmen suppliers. We note, however, that Liberty makes no claim that it was without knowledge of the payments to the suppliers by USF&G; nor does it allege that it had no means of ascertaining the real facts. Indeed, it knew of the outstanding debts of the suppliers and instead of applying sufficient of the funds it received from Hester to those debts paid the same to Maxwell who, at the instance of Sidwell, its managing officer, diverted them to other indebtedness. By this action Liberty precipitated the very problem it now tries to escape by a plea of estoppel. Nor is there any finding by the District Court of any concealment by USF&G of its payments to the suppliers. All that the District Court found in this regard was that USF&G preferred to have Liberty over Maxwell as a subcontractor on the job and that USF&G knew of the indemnity or hold harmless clause in the assignment from Maxwell to Liberty. Certainly the doctrine of estoppel requires much more than we have here. See *Board of County Commissioners of Marshall County v. Snellgrave*, 428 P.2d 272, 276 (Okl.1967); *Wheeler v. Brock Co.*, 418 P.2d 693 (Okl.1966); *Hillers v. Local Federal Savings and Loan Association*, 232 P.2d 626 (Okl.1951). We might add, that at argument it was undenied that USF&G understood that unless it paid the suppliers the job would be closed down and that the taking over of the work of Maxwell by Liberty was all maneuvered by Sidwell and that all of the facts concerning the outstanding claims of the suppliers were well known to the parties involved.

■ 3. Likewise the attack by Liberty on the allowance to Newcombe for $608.00 as his attorney fee in filing the interpleader has no merit. Buckner and Moore were stakeholders for the $20,602.00 paid to it by the School District in final payment under the general contract. It was attempting to escape being brought into the controversy between its subcontractors and the bonding company and instead of holding the money itself, paid the same into court so that the court might itself decide who was entitled to the funds. It followed the common practice in this regard and ordinarily a fund so deposited is chargeable with the reasonable fees incurred. There is no attack here on the reasonableness of Newcombe's charge and we find the claim that the fees are not chargeable to the funds to be frivolous. See Moore's Federal Practice, ¶ 22.16(2); *United States v. Chapman*, 281 F.2d 862, 870–871 (10th Cir. 1960).

■ 4. As to Sidwell's appeal, we do not find it necessary to pass upon the timeliness of its filing and, therefore, pass to the merits. We find Sidwell's claims frivolous. Oklahoma law is crystal clear on the point. The District Court found—and we find ample evidence in the record in support thereof—that Liberty, after it had been assigned the sub-contract of Maxwell, received certain funds from Hester for work done by Maxwell while it was performing the sub-contract. Liberty paid these funds to Maxwell. Sidwell, who was Chief Executive Officer of Maxwell, personally diverted the funds to the payment of other indebtedness of Maxwell rather than to the payment of the materialmen, which USF&G later paid.[2] The funds

2. The finding of fact in this regard is No. 7 and reads as follows:
"T. W. 'Tony' Sidwell was at all times the Chief Executive Officer of Maxwell Sheet Metal Contractors, Inc., and Universal Dynamic Scientific & Engineering Consulting, Inc., and he personally directed the payment of certain bills owing by these two companies after he received the money from Liberty Mechanical & Electrical Contractors, Inc. At the time he knew that the bills involved in this case and which were paid by the Plaintiff were due and outstanding and he held the sums as trustee under a statutory

thus diverted by Sidwell were implanted with a statutory trust requiring that they be paid to the materialmen. Indeed, the statute involved not only requires the corporation receiving such trust funds to pay them to the materialmen but makes both it and "its managing officers . . . liable for the proper application of such trust funds." 42 Okla.Stat. 153(2). Since Sidwell was at all times relevant here the Chief Executive Officer of Maxwell, its "managing officer," and since he personally directed that the trust monies be diverted to other debts, Sidwell is personally responsible and the judgment against him was entirely proper. Sidwell seems to say that Liberty did not plead nor prove "fraud." We find the pleading sufficient under the Oklahoma Statute whether it amounts to a charge of "fraud" or not. The funds were by statute trust funds and both Maxwell and its "managing officer" Sidwell were obligated to pay them to the materialmen. Failing so to do, both are liable to Liberty as well as to USF&G.

The judgment of the District Court is therefore

Affirmed.

obligation to pay these bills in question, yet he devoted much of the money to other pur-

poses and paid bills for some other corporations that are not involved in this case."