In re Kenneth Todd COWLEY, Debtor.

**AMERICAN METALS CORPORATION,
E.L. Bittner, Trustee, Plaintiffs,**

v.

**Kenneth Todd COWLEY, Defendant.**

Bankruptcy No. 82-20972.
Adv. No. 82-0283.

United States Bankruptcy Court,
D. Kansas.

Dec. 1, 1983.

Hosea Ellis Sowell, Kansas City, Kan., for debtor.

E.L. Bittner, Leawood, Kan., trustee.

James S. Willis, Kansas City, Kan., for plaintiff.

Kris L. Arnold, Kansas City, Kan., successor trustee.

## MEMORANDUM OPINION AND ORDER

BENJAMIN E. FRANKLIN, Bankruptcy Judge.

This matter came on for trial on June 30, 1983, and concluded on July 1, 1983. Plaintiff, American Metals Corporation (AMC) and its trustee, plaintiff, E.L. Bittner, appeared by the attorney for the trustee, James S. Willis of McDowell, Rice & Smith, Chartered. Debtor/defendant, Kenneth Cowley, appeared in person and by his at-

torney, Hosea Ellis Sowell. Trial was on AMC's dischargeability complaint, brought under 11 U.S.C. § 523(a)(4).

## FINDINGS OF FACT

Based on the exhibits, testimony, pleadings and file herein, the Court finds as follows:

1. That the Court has jurisdiction of the parties and subject matter pursuant to Rule 42 of the U.S. District Court, District of Kansas; and that venue is proper.

2. That the debtor was president of AMC from 1976 to 1981. In December of 1980, the end of AMC's fiscal year, the annual physical inventory disclosed a $188,-000.00 shortage in inventory. The shortage was never explained or accounted for. The debtor did not implement any changes despite suggestions from AMC's principal secured creditor that AMC's employees be bonded or that AMC adopt a field warehouse setup.

3. That AMC filed a Chapter 11 petition in this Court on March 23, 1981. The debtor continued as president of AMC, a debtor in possession. On April 30, 1981, another physical inventory was taken, revealing a mere $2,853.91 shortage.

4. That at the request of the unsecured creditors' committee, the Court appointed a special agent to audit AMC's operations. The special agent, Charles Merritt, filed a report on June 25, 1981, giving AMC a clean bill of health, finding the management competent.

5. That in August of 1981 the creditors' committee moved for conversion of AMC to Chapter 7, or in the alternative, appointment of a trustee. The Court found that there was no reasonable likelihood of rehabilitation; that there has been an inability to effectuate a plan and the estate was suffering continuing losses. On September 16, 1981, the Court sustained the application for an appointment of a trustee, and on the same date, E.L. Bittner was appointed trustee by the U.S. Trustee pursuant to 11 U.S.C. § 151104. As of September 16, 1981, the debtor no longer controlled AMC's oper-ations, the trustee did. The debtor remained an employee of AMC as a salesman.

6. That the trustee immediately took steps to thwart rumored after-hours thefts of inventory. He changed locks on all doors and on the alarm system. Only three people were authorized to have or use keys: the trustee; Daryl York, the warehouse manager; and James Curren, the controller. Prior to the trustee being appointed, at least six people had keys, but that was necessitated, in part, by having a large staff (25–30 employees before trustee; 5–6 employees by time trustee was appointed), and having more buildings (3 warehouses before the trustee, 1 warehouse at the time trustee was appointed). H.W. Cowley, father of the debtor, testified that after the trustee had been appointed he returned to AMC's premises one business day to find the warehouse open and unattended, and that anyone could have stolen the inventory on that day. The metal inventory came in heavy coils or flat sheets called skids, that could be moved only by forklift and/or truck.

7. That the trustee testified he kept AMC's inventory control system, whereby the amounts, types and prices of inventory on hand were recorded on index cards on each item of inventory. However, he required written documentation of each sale by purchase orders and the warehousemen were prohibited from filling a purchase order until they received a "release order". Before the trustee was appointed, orders had sometimes been filled without any written documentation. The trustee also instituted "inventory spot checks" requiring warehousemen to immediately search for and locate missing inventory. Occasionally, both before and after the trustee, inventory stock cards would indicate that there was a sufficient amount of an item to fill a certain order, but the warehousemen could not find enough of such item to fill the order. The trustee required that the warehousemen find the inventory or account for the discrepancy immediately. Before the trustee, they were directed to search for missing inventory when they had time.

9. The trustee also restricted AMC's policy on scrap metal, requiring an accounting of all scrap metal sold. Before the trustee's appointment, AMC had sold scrap metal to various companies, including Asner, a scrap metal dealer. The debtor could not recall a specific transaction testified to by Daryl York, the warehouse manager, wherein 15 to 20 coils were sold to Asner as scrap. York did not know the cost or selling price of such coils and could not state whether the coils were high grade or whether AMC took a loss on the sale.

10. That on December 31, 1981, the debtor left AMC's employ.

11. That on May 31, 1982, a physical inventory of AMC was taken at the trustee's direction, the first inventory since the trustee's appointment in September of 1981. It is undisputed that this physical inventory revealed a shortage of $104,898.80. No one knows with any certainty how or when the shortage occurred. The shortage was never accounted for.

12. That one of the debtors' sales accounts while he was president and while he was a salesman for AMC, was TWA. A review of TWA invoices disclosed a much higher gross profit on sales to TWA than on other sales. Profit margins among AMC's accounts always varied because pricing depended on the nature and history of the customer, and the type and availability of the inventory sold to the customer. The debtor testified that TWA sometimes ordered expensive or hard to find items.

13. That Pete Carter, a friend of the debtor's ex-partner, Vern Howard, used a mobile home belonging to AMC, rent free, even after Howard left AMC in the spring of 1980. Thereafter, the debtor attempted to recover it from Carter; but not until the trustee was appointed were there successful steps taken to recover it.

14. That in August, 1981, prior to the trustee's appointment, AMC sold two Corvettes, a 1958 and a 1978, to Metro North Ford for a package price of $9,300.00. Daryl York had bid $5,000.00 for the 1958 Corvette. There is no evidence of the fair market value of either vehicle at that time.

A few months after the sale, Metro North Ford sold the 1978 Corvette to the debtor's ex-wife for an unknown price. The debtor testified that she wanted that car and it was part of their divorce settlement. The Court takes judicial notice of the file in *King v. Cowley,* 35 B.R. 520 wherein a copy of their divorce decree states that the debtor's ex-wife was to receive a station wagon in their division of property. The Corvette was not mentioned in any of the divorce documents included in the file.

15. That the debtor filed a Chapter 7 petition in this Court on October 4, 1982.

## CONCLUSIONS OF LAW

The plaintiffs contend that the debtor owes AMC $104,898.80, the amount of the inventory shortage. They contend the debt is nondischargeable under 11 U.S.C. § 523(a)(4) because it arose out of the debtor's defalcation while acting as a fiduciary of AMC. At the outset, it should be noted that to the extent the debtor has a fiduciary obligation to AMC, the trustee is a proper party to pursue such obligation. *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939).

11 U.S.C. § 523(a)(4) states as follows:
"§ 523. Exceptions to discharge.
*(a) A discharge under section 727, 1141 or 1328(b) of this title does not discharge an individual debtor from any debt—*

&ast; &ast; &ast; &ast; &ast; &ast;

*(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny;"*

Bankruptcy Rule 4005 puts the burden of proving the elements of a § 523 action on the plaintiff. Here the plaintiffs must prove two elements: that the debtor was a fiduciary of AMC; and that while a fiduciary, the debtor committed a defalcation.

With respect to the first element, it has long been settled that a corporate officer is a "fiduciary" of the corporation, within the meaning of § 523(a)(4) and § 17(a)(4), its predecessor section under the

Bankruptcy Act of 1898. *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *John P. Maguire & Co. v. Herzog,* 421 F.2d 419 (5th Cir.1970); *Lawrence T. Lasagna, Inc. v. Foster,* 609 F.2d 392 (9th Cir.1979).[1]

Kansas law also defines corporate officers as fiduciaries of the corporation. *Delano v. Kitch,* 542 F.2d 550 (10th Cir.1976); *Parsons Mobile Products, Inc. v. Remmert,* 216 Kan. 256, 531 P.2d 428 (1975); *Newton v. Hornblower,* 224 Kan. 506, 582 P.2d 1136 (1978).

Thus, the debtor was a fiduciary of AMC from 1976 to December 31, 1981, his tenure as president.

■ With respect to the second element, a number of courts and commentators have defined "defalcation". Generally, defalcation is a failure to account for money or property that has been entrusted to one. *Matter of Vickers,* 577 F.2d 683 (10th Cir. 1978); *Central Hanover Bank & Trust Co. v. Herbst,* 93 F.2d 510 (2d Cir.1937); Cowans Bankruptcy Law and Practice ¶ 6.43 (Interim ed. 1983). It is broader than embezzlement or misappropriation. It can be a mere deficit resulting from the debtor's misconduct, even though he derived no personal gain therefrom. 3 Colliers on Bankruptcy (15th ed.) § 523.14[1][b]. It is the slightest misconduct, and it may not involve misconduct at all. Negligence or ignorance may be defalcation. 1 Norton Bankruptcy Law and Practice ¶ 27.51 (1981), citing *In re Duttenhofer,* 12 B.R. 926, 7 B.C.D. 1187 (Bkrtcy.C.D.Cal.1981) [inability to account for trust funds]; *In re Matheson,* 10 B.R. 652, 7 B.C.D. 643 (Bkrtcy.S.D.Ala.1981) [unintentional misuse of trust fund].

■ Here there was no direct evidence of when, how or who was involved in the $104,898.80 inventory shortage. The shortage occurred sometime between the April 30, 1981 and May 31, 1982 inventories. During this 13-month period, the debtor was in control of AMC for 4½ months and the trustee was in control for 8½ months.

The plaintiffs argue that it is more likely the shortage occurred during the 4½ months the debtor was in control. They point to debtor's failure to take steps to avoid inventory theft after the $188,000.00 shortage in 1980, as compared to the trustee's immediate steps to thwart inventory theft. They also allege that the debtor had a history of treating AMC property as his own, as evidenced by his neglect of the mobile home and his sale of the Corvettes for AMC, followed by his ex-wife's purchase of one of the vehicles. They also point to his relaxed scrap metal policy and nonchalant practice of allowing sales without written documentation.

The Court will first note that there has been no showing of defalcation with respect to the mobile home and Corvettes. The debtor testified that he attempted to get the mobile home back before the trustee was appointed but he was unsuccessful. The plaintiffs failed to show otherwise. Furthermore, the plaintiffs failed to show that the debtor's sale of the Corvettes to Metro North Ford on AMC's behalf, was not an arms length, fair market value transaction.

The debtor's loose policy of selling scrap metal does not constitute defalcation either. The plaintiffs did not show the sales were for less than fair market value. Furthermore, the debtor convincingly argued that selling the inventory as scrap metal was preferable to allowing interest to accrue on floor plan financing indefinitely.

Moreover, although the trustee kept better documentation of sales than the debtor did, that still does not prove when the shortage occurred. If the debtor's management of AMC had been consistently bad, there would undoubtedly have been a significant inventory shortage in April of 1981, and Charles Merritt would not have given AMC a clean bill of health in his June 25, 1981 report. But, despite the debtor's looser practices regarding record keeping, there was no significant shortage in April of 1981.

---

1. A corporate officer may not be a fiduciary of the corporation's creditors absent a statutory, technical or express trust. *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *In re Romero,* 535 F.2d 618 (10th Cir.1976).

The Court refuses to infer that the $104,-898.80 shortage had to have occurred during the 4½ month period that the debtor was in control of AMC. In spite of the trustee's protective measures, issuing fewer keys and changing locks, according to H.W. Cowley, on at least one occasion, the warehouse was wide open and unattended on a business day.

The plaintiffs have simply failed to prove that the debtor committed a defalcation. There was no showing that the shortage occurred before the trustee's appointment or before the debtor left AMC's employ in December of 1981. If the shortage occurred between January and May of 1982, it would definitely not be due to any negligence or misconduct of the debtor.

The Court finds that the debtor's laxity in managing AMC was not unparalleled. The trustee exercised poor business judgment, as well. He was appointed in September of 1981, five months after the April, 1981 inventory. Given the huge inventory shortage in 1980, given the debtor's failure to change practices after the shortage, and given the debtor's lax policies on scrap metal and recordkeeping, the trustee should have taken an inventory immediately upon his appointment. Instead he waited until 8 months after his appointment and 5 months after the debtor had left AMC's employ.

Because of the trustee's poor business judgment, there is no way to discern when the $104,898.80 in inventory disappeared. The Court finds that the plaintiffs herein have failed to sustain their burden of proving by a preponderance of the evidence, that said $104,898.80 disappeared while the debtor was in control or that it disappeared at the hands of said debtor/defendant.

IT IS THEREFORE, BY THE COURT, CONSIDERED AND ORDERED That judgement be and the same is for the defendant and against the plaintiffs.

IT IS FURTHER, BY THE COURT, ORDERED That the debt herein be and the same is hereby discharged as to the defendant.