**In re George E. FAILING, Debtor.**

**SAN SABA PECAN, INC., Plaintiff,**

**v.**

**George E. FAILING, II, Defendant.**

No. CIV–88–1639–T.
Bankruptcy No. 87–5639A.
Adv. No. 87–0557.

United States District Court,
W.D. Oklahoma.

June 2, 1989.

Ronald G. Franklin, Enid, Okl., for plaintiff.

J. Raymond Karam, San Antonio, Tex., for defendant.

## ORDER

RALPH G. THOMPSON, Chief Judge.

This is an appeal of the bankruptcy court's determination in an adversary proceeding that a certain debt is not subject to the exceptions to discharge set forth in 11 U.S.C. § 523(a)(2), § 523(a)(4), and 11 U.S.C. § 727. Both San Saba Pecan, Inc. (the appellant here and the plaintiff in the adversary proceeding) and George Failing, II (the appellee here, the defendant in the adversary proceeding, and the debtor in the bankruptcy case) have briefed the matter, and the issues presented are ready for determination.

## FACTUAL BACKGROUND

This matter arises out of a loan commitment agreement entered into between the appellant, San Saba Pecan, Inc. (San Saba) and American Fidelity Mortgage Company (American Fidelity) in October 1985. San Saba is a pecan shelling company based in San Antonio, Texas that, in 1985, sought to restructure its financing. Some time in the late summer or early fall of that year, Mr. Randy Adams, the owner of San Saba, contacted Mr. Martin Spieckerman, a loan officer of Wells Fargo Bank in San Antonio in order to inquire about the refinancing of San Saba. Mr. Spieckerman referred the plaintiff to the defendant, Mr. George Failing, II, the president of American Fidelity, a company based in Enid, Oklahoma.

Following a series of discussions, Mr. Adams, on behalf of San Saba, and Mr. Failing, on behalf of American Fidelity, entered into a loan commitment agreement under which American Fidelity was granted the exclusive right to obtain financing for San Saba. Under this agreement, San Saba was required to make a $30,000.00 "conditionally refundable good faith deposit" as well as a $750.00 deposit for expenses. In addition, American Fidelity was entitled to a loan origination fee of 1% of the total amount of any financing that it obtained for San Saba. On behalf of San Saba, Mr. Adams sent a check for $30,-750.00 to American Fidelity on the same day that he executed the contract, October 1, 1985.

At trial, conflicting testimony was given regarding the manner in which San Saba's deposit was to be handled by American Fidelity. Mr. Adams testified that upon discovering that such a deposit would be required, he became concerned and called Mr. Spieckerman to ask if Mr. Failing "could be trusted with that kind of money." After receiving assurances from Mr. Spieckerman, Mr. Adams explained at trial, he then asked Mr. Failing how the deposit would be managed. According to Mr. Adams, Mr. Failing then stated that the $30,000.00 deposit would be placed in a trust fund and that neither San Saba nor American Fidelity would be able to draw interest on the deposit. Similarly, Mr. Spieckerman testified that in the course of a number of business dealings, Mr. Failing had repeatedly told him that such deposits were held in trust. In contrast, Mr. Failing testified at trial that he never indicated that the $30,000.00 sum would be placed in trust and that, in fact, the deposit was placed in American Fidelity's general account.

After the parties signed the loan commitment agreement and San Saba forwarded its deposit, Mr. Failing, on behalf of American Fidelity, made several attempts to obtain financing for San Saba. However, Mr. Failing was unable to obtain any financing that was acceptable to San Saba. As a result, in early August, 1986, Mr. Adams notified Mr. Failing by telephone that he wished to terminate the loan commitment agreement and asked that Mr. Failing return San Saba's $30,000.00 deposit. Mr. Failing responded that he would need to consult with various individuals involved in American Fidelity's business before the deposit could be returned. On August 18, 1986, Mr. Adams sent a letter to Mr. Failing in which he stated that he was terminating the loan commitment agreement and demanding the return of the deposit.

After receiving this letter, Mr. Failing telephoned Mr. Adams to discuss it with him. At trial, Mr. Failing and Mr. Adams also gave differing accounts of this conversation. According to Mr. Adams, Mr. Failing told him that he had discovered a law-

yer in Washington, D.C. who might be able to assist San Saba in obtaining financing. Mr. Adams further stated that Mr. Failing then asked him if he wanted Mr. Failing to contact the lawyer. As Mr. Adams described this conversation, he then told Mr. Failing that "whatever he wanted to do was fine but I wanted my money back and I wanted to terminate this contract."

In response, Mr. Failing stated at trial that Mr. Adams did not make such a statement. According to Mr. Failing's testimony, when he called Mr. Adams, he expressly told him that if the contract was terminated, he would be unable to pursue the Washington financing on behalf of San Saba. Mr. Adams replied that he wanted Mr. Failing to pursue the financing, and Mr. Failing interpreted this statement as a revocation of the August 18, 1986 letter purporting to terminate the contract. According to Mr. Failing, after this telephone conversation, his view was that the loan commitment agreement remained effective.

Following this conversation, throughout September, October and November 1986, Mr. Adams continued to demand the return of the $30,000.00 deposit. He testified that he called Mr. Failing four or five times during this period to inquire about the money but was never given a clear explanation of the reason for the delay in returning it.

During one of these telephone conversations, in November, 1986, Mr. Adams mentioned to Mr. Failing that he had succeeded in obtaining financing for San Saba through his Texas bank. Mr. Failing then requested documentation of this financing, and Mr. Adams sent it to him. Subsequently, on November 24, 1986, Mr. Failing sent a letter to Mr. Adams stating that under the loan commitment agreement, American Fidelity was entitled to a loan origination fee in the amount of 1% of the $5,000,000.00 in financing that San Saba had obtained, (i.e. $50,000.00). Accordingly, American Fidelity requested payment from San Saba of an additional $20,000.00, representing the difference between the $30,000.00 that it had already received in the form of the initial deposit and the $50,-000.00 loan origination fee that it claimed.

Mr. Adams refused this request, contending that the loan commitment agreement had been terminated by means of the August 18th letter. Subsequently, San Saba filed an action in the Western District of Texas against American Fidelity and Mr. Failing in which it alleged that it had been defrauded out of the $30,000.00 deposit. Mr. Failing then filed bankruptcy in this district, and San Saba commenced the instant adversary proceeding.

In its complaint, San Saba alleges that Mr. Failing misled Mr. Adams by representing to him that the $30,000.00 deposit would be returned if American Fidelity did not obtain financing for San Saba and that, as a result, Mr. Failing violated the Texas Deceptive Trade Practices Act. It further maintains that Mr. Failing's liability for the $30,000.00 deposit should not be discharged from bankruptcy and that it is entitled to recover actual and exemplary damages, attorney's fees, costs and interest. Mr. Failing's answer to the complaint states that since the loan commitment agreement was entered into between American Fidelity and San Saba, he should not be held personally liable for any alleged breach of the terms of that agreement.

The adversary proceeding was tried to the bankruptcy court on June 23, 1988. At trial, counsel for San Saba characterized the action as an objection to discharge under 11 U.S.C. § 523 and 11 U.S.C. § 727. After hearing the testimony of Mr. Adams, Mr. Spieckerman, and Mr. Failing, the bankruptcy court entered judgment in favor of Mr. Failing. The court first concluded that San Saba had not proved the elements necessary to avoid discharge under either 11 U.S.C. § 727 or 11 U.S.C. § 523(a)(2)(A). With regard to discharge under 11 U.S.C. § 523(a)(4), the court found that San Saba's deposit was received by American Fidelity pursuant to an understanding that it would be kept in an express trust. The court further found that the loan commitment agreement was terminated by means of the August 18, 1986 letter from Mr. Adams to Mr. Failing. As a result, the court concluded that "the plaintiff [San Saba] here was, in my estimation, cheated out of the money."

However, the court further found that San Saba had been defrauded by American Fidelity rather than Mr. Failing. It found, pursuant to *Fish v. East*, 114 F.2d 177 (10th Cir.1940), that San Saba had failed to establish the elements necessary to pierce the corporate veil such that Mr. Failing could be held personally liable for the $30,000.00 deposit. It is this conclusion that San Saba now challenges on appeal.

### DISCHARGE UNDER 11 U.S.C. § 523(a)(4)

11 U.S.C. § 523(a)(4) provides:

A discharge under § 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt ... for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

■ Under this statute, "defalcation" refers broadly to "a failure to account for that that has been entrusted to one." *In Re Cowley*, 35 B.R. 526, 529 (Bankr.D.Kan. 1983). The term is broader than embezzlement or misappropriation, and "can be a mere deficit resulting from the debtor's misconduct, even though he derived no benefit therefrom." Id. at 529. Defalcation may also result from the debtor's negligence or ignorance. Id. at 529.

■ However, under 11 U.S.C. § 523(a)(4), the term "fiduciary" is defined more narrowly. It does not refer to any relationship involving confidence, trust or good faith but rather concerns a relationship arising out of an express, technical or statutorily imposed trust. *In Re Simpson*, 37 B.R. 132 (Bankr.D.N.H.1984). Similarly, it does not refer to fiduciary relationships arising out of equity or implied by law as arising out of contract. Moreover, in order to constitute a fiduciary under 11 U.S.C. § 523(a)(4), the relationship must arise before the act of alleged wrongdoing rather than as a result of that wrongdoing. *In Re Pedrazzini*, 644 F.2d 756 (9th Cir.1981); *In Re Romero*, 535 F.2d 618 (10th Cir.1976);

*In Re Niven*, 32 B.R. 354 (Bankr.W.D.Okla. 1983).

■ In the instant case, as noted above, the bankruptcy court concluded that, as to San Saba's $30,000.00 deposit, an express trust relationship existed between American Fidelity and San Saba. This finding was based on the bankruptcy court's assessment of the testimony of Mr. Adams, Mr. Spieckerman, and Mr. Failing. Such a fact-based conclusion must be accepted unless clearly erroneous. *See In Re Branding Iron Motel, Inc.*, 798 F.2d 396, 399 (10th Cir.1986). In this Court's opinion, this finding is not clearly erroneous, and the Court thus affirms the bankruptcy court's determination that an express trust existed as to the $30,000.00 deposit.[1]

■ However, the bankruptcy court's conclusion that Mr. Failing could not be held liable for the deposit because San Saba failed to establish the elements necessary to pierce the corporate veil constitutes a legal conclusion that is subject to de novo review by this court. *Branding Iron Motel*, 798 F.2d at 399–400. Upon review of the record and the applicable law, the court finds that the bankruptcy court erred in concluding that Mr. Failing could not be held personally liable such that the exception to discharge set forth in 11 U.S.C. § 523(a)(4) did not apply.

This conclusion is supported by a number of decisions holding that the exception to discharge set forth in 11 U.S.C. § 523(a)(4) applies to corporate officers who directly participate in a fraud or defalcation of a creditor even if such officers are acting in the scope of their employment and even if the corporation rather than the individual officer is actually the fiduciary under the contract or statute that establishes the trust relationship. See e.g. *In Re Interstate Agency, Inc.*, 760 F.2d 121, 125–126 (6th Cir.1985); *In Re Currin*, 55 B.R. 928, 935–936 (Bankr.D.Colo.1985); *Matter of*

---

1. Here, neither party disputes the legal proposition that, accepting the testimony of Mr. Adams and Mr. Spieckerman as true, Mr. Failing's promise to hold the deposit in trust, combined with his acceptance of the deposit, was sufficient to create an express trust under Oklahoma

law. See *In Re Niven*, 32 B.R. 354, 356 (Bankr. W.D.Okla.1983) ("... For an express trust to be created, there must be a trustee designated and a present intention to create a trust by the party having the legal and equitable control of the subject matter.")

*Koszuth,* 43 B.R. 104, 107–108 (Bankr.M.D. Fla.1984); *Matter of Folliard,* 10 B.R. 875, 876–877 (D.Md.1981). A corporate officer may be excepted from discharge under § 523(a)(4) even if he or she does not personally profit from the defalcation in question. *See Folliard,* 10 B.R. at 876–877; *Koszuth,* 43 B.R. at 107. As the Court reasoned in *Koszuth:*

> A corporation acts only through its officers and employees. When a corporation as an entity is placed in a fiduciary capacity it is the corporate officer who is charged with performing the fiduciary duties and living up to the terms of the agency. If the fiduciary relationship is not imposed upon the corporate officer charged with maintaining the fiduciary relationship, then § 523(a)(4) could be rendered meaningless in cases in which the fiduciary relationship is established between a creditor and a corporate fiduciary only. All a debtor would have to do to avoid § 523(a)(4) is place the corporation in the position of fiduciary rather than himself. He could then breach the fiduciary relationship with impunity.

43 B.R. at 108.

This reasoning is directly applicable to the case at bar. Here, it is uncontroverted that, at the time the loan commitment agreement was entered into, Mr. Failing was the sole officer and 100% owner of American Fidelity and that he alone was responsible for requiring the $30,000.00 deposit from San Saba and for the management of the deposit once it was received. In light of the bankruptcy court's finding that the parties agreed to place the deposit in an express trust, that the August 18, 1988 letter from Mr. Adams terminated the loan commitment agreement, and that San Saba was subsequently "cheated out of its money" when the deposit was not returned, the Court finds that Mr. Failing personally participated in the defalcation of trust property such that the $30,000.00 deposit should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(4).[2] Accordingly, the decision of the bankruptcy court is reversed, and the case is remanded to the bankruptcy court for proceedings consistent with this opinion.[3]

IT IS SO ORDERED.

2. In this Court's opinion, this conclusion is not inconsistent with the holding of *Fish v. East,* 114 F.2d 177 (10th Cir.1940) as to the elements that must be established in order to pierce the corporate veil. In *Fish,* the Tenth Circuit did not address the issue of a corporate officer's personal liability for torts in which he personally participated. In fact, in a number of decisions issued after *Fish,* courts have determined that, under Oklahoma law, an officer may be held liable for the torts that he personally commits. See e.g. *United States Fidelity & Guaranty Co. v. Sidwell,* 525 F.2d 472 (10th Cir.1975); *All American Car Wash, Inc. v. National Pride Equipment, Inc.,* 550 F.Supp. 166 (W.D.Okl.1981); *Preston–Thomas Construction, Inc. v. Central Leasing Corp.,* 518 P.2d 1125 (Okl.App.1973). The cases construing 11 U.S.C. § 523(a)(4) that are cited elsewhere in this order simply set forth the bankruptcy analogue to this general rule of personal liability.

3. In light of the finding that the exception to discharge set forth in 11 U.S.C. § 523(a)(4) applies to the $30,000.00 deposit, the Court makes no finding as to discharge under 11 U.S.C. § 523(a)(2) or 11 U.S.C. § 727.