**In re Manuel KAPLAN, Debtor,**

**v.**

**FIRST OPTIONS OF CHICAGO, INC.**

**Civ. A. Nos. 93–6401, 93–6402 and 93–6622.**

United States District Court,
E.D. Pennsylvania.

Nov. 6, 1995.

Donald L. Perelman, Fine, Kaplan & Black, Philadelphia, PA, Gary A. Rosen, Connolly Epstein Chicco Foxman Engelmyer & Ewing, Philadelphia, PA, for Manuel Kaplan.

Vincent J. Marriott, III, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, PA, Stephen P. Bedell, Timothy G. McDermott, Gardner, Carton & Douglas, Chicago, IL, for First Options of Chicago, Inc.

Frederic Baker, Assistant U.S. Trustee, Philadelphia, PA.

## MEMORANDUM

TROUTMAN, Senior District Judge.

This bankruptcy appeal arises out of an October 26, 1993, order of the United States Bankruptcy Court for the Eastern District of Pennsylvania. The bankruptcy court proceeding emanated from an individual voluntary Chapter 11 filing of Manuel Kaplan ("the Debtor"), the owner of MK Investments, Inc. ("MKI").[1]

The appeal involves two separate issues raised by First Options of Chicago, Inc., a clearing member of the Philadelphia Stock Exchange ("PSX") and creditor of the Debtor. The first issue involves an objection to the Debtor's claimed exemptions, particularly his interest in MKI's pension plan. The second issue pertains to an objection to dischargeability of a debt in the amount of $611,300.

The bankruptcy court (Honorable David A. Scholl) held that the Debtor was entitled to a full exemption of benefits deriving from the MKI pension plan, at least pending a later disqualification by the Internal Revenue Service within 180 days after confirmation of a plan of reorganization. The bankruptcy court, however, did sustain the objection to Debtor's claimed exemption of property located in New Jersey which he owned in tenancy by the entireties.

Regarding the dischargeability issue, the court did not find any portion of Debtor's

---

1. MKI had been a successful business engaged in trading on the Philadelphia Stock Exchange until the devastating stock market crash of October, 1987.

obligation to First Options non-dischargeable under the fraud or defalcation prong of 11 U.S.C. § 523(a)(4). Moreover, the court found that a valid release existed which essentially effected a novation of the liability of the Debtor to First Options stemming from any potentially non-dischargeable debt.

## I. JURISDICTION and STANDARD of REVIEW

The October 26, 1993, bankruptcy order is a final order entered in a core proceeding under 28 U.S.C. § 157(b)(2)(E). This Court has jurisdiction over the appeal under 28 U.S.C. § 158(a).

 In cases originating in the bankruptcy court, this Court occupies the first level of appellate review. It is settled law that our role is to apply a clearly erroneous standard to findings of fact, while applying a *de novo* standard of review to questions of law. *In re Molded Acoustical Prod., Inc.,* 150 B.R. 608, 612 (Bankr.E.D.Pa.1993); *Universal Minerals, Inc. v. C.A. Hughes & Co.,* 669 F.2d 98, 102 (3d Cir.1981). In addition, mixed findings of fact and law must be separated, with the appropriate standard applied to each component. *See, e.g., Resyn Corp. v. United States,* 851 F.2d 660, 664 (3rd Cir.1988); *In re. Jersey City Medical Center,* 817 F.2d 1055, 1059 (3rd Cir.1987).

With respect to the "clearly erroneous" standard, the Supreme Court has stated, "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948) quoted in *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

Due to the complicated nature and convoluted fact pattern of the present case, it seems wise to emulate the format of the bankruptcy court opinion and address each issue separately. Accordingly, we will first review the exemption issue and then proceed to the issue of dischargeability.

## II. THE EXEMPTION ISSUE

### A. Pertinent Facts and Procedural History in the Bankruptcy Proceeding

The debtor is the President of MKI, which was formerly a stock options trader on the PSX. The predecessor to MKI was MK Associates, Ltd., ("MKA"), a partnership formed in 1981 in which the debtor, Manuel Kaplan, was the majority partner and Michael Becker was a minority partner. In 1984, MKA was dissolved and a subchapter S corporation, MKI, owned by both Kaplan and Becker, was formed.

Becker testified that he devoted between 300 and 350 hours per year to the trading efforts of MKI. In November of 1986, Becker terminated his interest in MKI by selling his shares of stock to Kaplan, leaving Kaplan as the sole shareholder.

As of January 1, 1984, MKA adopted a defined pension plan ("the Plan") under 401(a) of the Internal Revenue Code, (IRC), 26 U.S.C. § 401(a), effective January 1, 1984. Kaplan and Becker were the sole participants in the Plan. The Plan was drafted by Steven J. Fromm, an attorney specializing in pension and tax law.

The IRS issued a favorable tax qualification letter which MKA received on May 21, 1985. The letter stated, however, that "[c]ontinued qualification of the plan will depend on its effect in operation under its present form." [2] In 1984, MKI superseded MKA as the sponsor of the Plan and on September 2, 1986, MKI received a second favorable qualification letter. Once again, the letter conditioned continued qualification on the plan's effect in operation under its present form. From the outset, Kaplan and Becker were the sole participants in the Plan, since MKI had no other employees.

---

**2.** In the determination letter of May 21, 1984, the IRS stated, in part, as follows:

Based on the information supplied, we have made a favorable determination on your application. . . .

Continued qualification of the plan will depend on its effect in operation under its present form. The status of the plan in operation will be reviewed periodically.

On November 30, 1987, following the stock market crash of October, 1987, the Plan was frozen. Since that date, no additional benefits have accrued to the participants and no additional contributions have been made by MKI. Kaplan, however, continued to have annual actuarial reviews of the Plan done, and filed all required tax returns for it.

In July, 1989, about two and one half years after Becker terminated his interest in the company, Becker withdrew from the Plan. Becker received a payment of $203,985, which purportedly represented the amount of his accrued benefits to that date.

On February 2, 1993, the debtor elected to file a voluntary petition under chapter 11 of the bankruptcy code. In his schedule C, Kaplan claimed exemptions under 11 U.S.C. § 522(b)(2).[3] Specific property designated exempt under § 522(b)(2)(B) included: (1) art valued at $25,000; (2) a brokerage account valued at $41,647.00; (3) two condominiums located in Atlantic City, New Jersey, valued at $40,000 and $20,000, respectively; (4) furniture valued at $45,000; and (5) the debtor's residence in Penn Valley, Pennsylvania, valued at $800,000.

Under § 522(b)(2)(A), the debtor asserted that the following property was exempt pursuant to 42 Pa.C.S. § 8124(b)(1)(ix): a pension plan valued at $589,833 and an individual account valued at $16,311.00.[4]

First Options filed objections to the debtor's claimed exemptions within the thirty day time period specified in Federal Rule of Bankruptcy Procedure 4003(b).

In ruling on First Options objections, the bankruptcy court first determined that it was not precluded from adjudicating tax issues. The court then analyzed the pension plan, observing that under *Patterson v. Shumate*, 504 U.S. 753, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992), the debtor's interest in an "ERISA-qualified" pension plan which contains the antialienation language required by Section 206(d)(1) of ERISA, 29 U.S.C. § 1056(d), *may be excluded from the debtor's estate under Section 541(c)(2) of the Bankruptcy Code.*

In denying in part and granting in part First Options' objections, the bankruptcy court determined that the MKI plan was likely not an ERISA-qualified plan because neither Becker or Kaplan, the sole participants of the plan, were ever employees of MKI as that term is defined under ERISA. Nevertheless, the court held that the debtor's interest in the Plan was exempt under § 8124(b)(1)(ix) of the Pennsylvania statute, barring a subsequent determination of disqualification by the IRS. The court upheld First Options' objection to exemption of the New Jersey property.

### B. Discussion

### 1. Exemption of the Pension Plan

We begin our analysis of the bankruptcy court's decision by focusing on whether the pension plan is exempt, as claimed by the

---

**3.** This section of the bankruptcy code reads as follows:

(b) Notwithstanding section 541 of this title, an individual debtor may exempt from property of the estate the property listed in.... paragraph (2) of this subsection, ...
 (2)(A) any property that is exempt under Federal law, other than subsection (d) of this section, or State or local laws that is applicable on the date of the filing of the petition at the place in which debtor's domicile has been located for the 180 days immediately preceding the date of the filing of the petition, or for a longer portion of such 180–day period than in any other place; and (B) any interest in property in which the debtor had, immediately before the commencement of the case, an interest as such interest as a tenant by the entirety or joint tenant is exempt from process under applicable nonbankruptcy law.

**4.** The Pennsylvania statute reads as follows:

(b) Retirement funds and accounts.—
(1) Except as provided in paragraph (2) [relating to exemptions claimed inconsistent with a law inapplicable hereto], the following money or other property of the judgment debtor shall be exempt from attachment or execution on a judgment: .... (ix) Any retirement or annuity fund provided for under section 401(a), 403(a) and (b), 408 or 409, the appreciation thereon, the income therefrom and the benefits or annuity payable thereunder. This subparagraph shall not apply to: (A) Amounts contributed by the debtor to the retirement or annuity fund within one year before the debtor filed for bankruptcy. (B) Amounts contributed by the debtor to the retirement or annuity fund in excess of $15,00 within a one-year period. (C) Amounts deemed to be fraudulent conveyances.

debtor and as determined by the bankruptcy court or is part of the bankruptcy estate.

The filing of a petition in bankruptcy creates an estate consisting of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). The legislative history of § 541 indicates that this provision was intended to be interpreted in broad scope. *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 204–05, 103 S.Ct. 2309, 2313–14, 76 L.Ed.2d 515 (1983) *(citing,* S.Rep. No. 95–989, p. 82 (1978); H.R.Rep. 95–595 pp. 367–368 (1977), U.S.Code Cong. and Admin.News 1978, pp. 5787–5868, 6323–24.)

■ A debtor's interest in a pension plan constitutes "property of the estate" unless the interest is exempted or excluded from the estate. 11 U.S.C.A. § 522(b)(1), 541(a)(1), (c)(2).[5] Under § 522(b)(1) of the bankruptcy code, a debtor may claim as exempt any property that is exempt under federal, state, or local law.

■ Under the bankruptcy code a debtor is entitled to choose between certain statutory exemptions specifically enumerated under § 522(d) (the "federal exemptions"), or exemptions provided generally under state or local law of the debtor's domicile (the "state exemptions").[6]

■ Any party who objects to the exemptions claimed by the debtor bears the burden of proving that the exemptions should be denied. Bankruptcy Rule 4003(c).

■ Our initial inquiry focuses on whether the Pension Plan in which the debtor claimed an exemption is qualified under ERISA and thereby may be excluded from the bankruptcy estate under § 541. *See, Patterson v.*

*Shumate,* 504 U.S. 753, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992). The ERISA statute applies to "any employee benefit plan if it is established or maintained . . . by any employer engaged in commerce or in any industry or activity affecting commerce." 29 U.S.C. § 1003(a)(1).[7]

We conclude that the bankruptcy court correctly determined that the debtor and Becker were not "employees" as that term is defined in ERISA and, therefore, that the Plan was not ERISA-qualified.

A basic requirement of ERISA is that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purpose of providing benefits to participants in the plan. . . ." 29 U.S.C. § 1103(c)(1) (ERISA § 403(c)(1)). A "participant" is defined as "any employee or former employee of any employer . . . who is or may become eligible to receive a benefit of any type from an employee plan . . ." 29 U.S.C. § 1002(7).

To determine the status of the debtor and Becker as "employees", the bankruptcy court looked to the common law definition of "employee" found in the applicable Treasury Regulation, 26 C.F.R. § 31.3121(d)–1(c)(2), as well as to Pennsylvania case law. In addition, the Bankruptcy Court examined regulations promulgated by the Department of Labor pursuant to ERISA. By definition, "employees" exclude "an individual and his spouse . . . . with respect to a trade or business, whether incorporated or unincorporated, which is *wholly owned by the individual or by the individual and his or her spouse."* 29 C.F.R. § 2510.3–3. Moreover, said regulations provide that any plan in which no

---

5. Under § 522, certain property is exempted from the estate, while under section 541, property is excluded from the estate, *i.e.,* is not considered property of the estate in the first instance. *Goff v. Taylor,* 706 F.2d 574, 579 (5th Cir.1983).

6. Under § 522(b)(1) of the code, states are permitted to "opt out" of the federal exemption provision in § 522(d), thereby restricting their residents to the exemptions provided under state law. *In re Lane,* 149 B.R. 760 (E.D.N.Y.1993).

Pennsylvania, however, has not opted out of the federal exemptions.

7. An "employee benefit plan" under ERISA is defined in part as "an employee pension benefit plan." 29 U.S.C. § 1002(3).

Under 29 U.S.C. § 1002(2)(A), The terms "employee benefit plan" and "pension plan" mean any plan . . . which was heretofore or is hereafter established or maintained by an employer . . . to the extent that by its express terms or a result of surrounding circumstances, . . .
(i) provides retirement income to employees or
(ii) results in a deferral of income by employees for periods extending to termination of covered employment or beyond . . .

employees are participants covered under the plan cannot be considered an employee benefit plan.

In light of the aforementioned authority, the bankruptcy court accurately concluded that since the Plan's sole participants were its owners, the Plan did not cover any employees and, therefore, did not qualify under ERISA. *See, also, Nationwide Mutual Insurance Co. v. Darden,* 503 U.S. 318, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992); *In re Witwer,* 148 B.R. 930 (Bankr.C.D.Cal.1992) (Bankruptcy court held that the debtor was not a participant under ERISA because the regulation "unambiguously debars a sole shareholder from employee status".); *Fugarino v. Hartford Life & Accident Ins. Co.,* 969 F.2d 178 (6th Cir.1992) (Court held that "a plan whose sole beneficiaries are the company's owners cannot qualify as a plan under ERISA."); *In re Hall,* 151 B.R. 412 (Bankr. W.D.Mich.1993). (Bankruptcy court held that debtor and his spouse did not constitute "employees" under ERISA where debtor and his spouse were the sole beneficiaries of the pension plan).

Despite the bankruptcy court's holding that the plan failed to qualify under ERISA, the court did find that the plan could be exempted under the Pennsylvania statute, 42 Pa.C.S. § 8124(b)(1)(ix). Originally, this statute only provided that a debtor's interest in a pension plan set up by an employer for *employees* would be protected from creditors of the debtor. However, the statute was specifically amended by the Pennsylvania legislature in 1978 to clarify that retirement funds for self-employed persons would also be afforded the same protection from creditors. Thereafter, the statute was again amended, effective December 1990, to add

sub-section (ix), which specifically includes qualified pension plans and individual retirement accounts, indeed, "Any retirement or annuity fund *provided for under section 401(a), 403(a) and (b), 408 or 409 of the Internal Revenue Code of 1986 ....*"

The bankruptcy court premised its finding that the Plan is exempt under Pennsylvania law upon the IRS determination that the Plan was tax qualified, and upon the condition that the plan will continue to enjoy its tax qualified status.[8] Although additional comments indicate the court's belief that tax qualification may be unnecessary under the Pennsylvania statute, we will not review that aspect of the court's opinion.[9]

As a threshold matter, we note that, as the bankruptcy court observed, the determination of the validity of the debtor's claimed exemptions clearly constitutes a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (b)(2)(O). Moreover, we agree with the bankruptcy court's conclusion that it was obligated to adjudicate the issue of tax qualification since, "lack of specialized expertise in tax matters does not preclude bankruptcy courts from adjudicating tax issues. *Kaplan,* 162 B.R. at 695. *See,* 11 U.S.C. § 505. Thus, we acknowledge the bankruptcy court's power to reach the merits of the exemption issue and exercise *de novo* review of the legal conclusions reached by the bankruptcy court with respect to that issue.

In attempting to persuade this Court that the order of the bankruptcy court should be reversed, First Options argues on appeal that the MKI pension plan should not have been found exempt under the Pennsylvania statute because it neither qualifies under

---

8. "... [W]e condition the future effect of our ruling that the Plan is exempt on the Plan's continuing qualification ... [I]t seems senseless for this court to disqualify the Plan at this point, since the IRS has in the past and may well subsequently find it qualified. If the IRS intervenes at a later date and disqualifies the Plan, then and only then would it appear to us appropriate to preclude the Debtor from continuing to assert that its proceeds are exempt from the claims of the Debtor's creditors." *In re Kaplan,* 162 B.R. 684, 697 (Bkrtcy.E.D.Pa.1993).

9. In its discussion of the pension plan exemption issue, the bankruptcy court noted that, "We sim-

ply observe that the language of § 8124(b)(1)(ix) is very broad, and that it appears to have been drafted to include even plans which are not technically 'tax qualified' within its scope." 162 B.R. at 696.

We, however, express no opinion concerning the breadth of the Pennsylvania statute and the need for tax qualification thereunder. We conclude that such a determination is beyond the scope of our review of the bankruptcy court's decision, and, therefore, that our comments on that issue would be inappropriate at this time.

ERISA nor, more importantly, qualifies under § 401(a) of the Internal Revenue Code. At the very least, First Options stresses, the Plan must be tax qualified in order to be found exempt under the Pennsylvania statute. First Options maintains that absent such a finding of tax qualification, the plan should be retroactively disqualified.

In support of its argument that the Plan should be disqualified under I.R.C. § 401(a), First Options asserts the violation of the "exclusive benefit" rule found in I.R.C. § 401(a)(2) as the Plan's most egregious violation of appropriate standards. This rule states that no funds may be used for any purpose other than the "exclusive benefit" of employees. § 401(a)(2). First Options contends that the distribution to Becker violated the exclusive benefit rule because Becker was not an "employee" as defined under the code. First Options submits that Becker was never an employee because his number of working hours did not meet the definition of "employee" established in the MKI plan.

In addition, First Options maintains that even if Becker were an employee for purposes of the plan, the distribution to him violated I.R.C. § 415(b), in that it constituted an excessive benefit conferred upon a participant. Furthermore, First Options asserts that the distribution violated the requirement of providing a "definitely determinable benefit" under 26 C.F.R. § 1.401–1(b)(1)(i), because it distributed money to Becker in excess of his accrued benefit.

■ Our initial inquiry will focus on the underlying principle that the Plan must be "tax-qualified" under I.R.C. § 401(a) in order to be "qualified" under the Pennsylvania statute. We begin by focusing on the plain language of the statute and note that it exempts only "fund[s] provided for under section 401(a) ... of the Internal Revenue Code." 42 Pa.C.S. § 8124(b)(1)(ix). Language such as "provided for under" seems to indicate that in order to establish a valid

exemption under the Pennsylvania statute, the pension plan would have to comport with I.R.C. § 401(a). Thus, the Pennsylvania statute seemingly requires a plan to be tax qualified in order to be exempt for bankruptcy purposes.[10]

Notwithstanding this language, however, there is evidence to suggest that the intent of the Pennsylvania legislature in enacting the statute was to create a provision which would grant broad protection to pension plans. See, e.g., Senate Bill 1535, a precursor to the Pennsylvania Statute.[11]

Consequently, this Court, like the bankruptcy court, is not entirely persuaded that tax qualification under the I.R.C. is essential to establishing a valid exemption, for bankruptcy purposes, pursuant to the Pennsylvania statute.

Nevertheless, as noted, despite the bankruptcy court's reservations concerning the need for the Plan to meet the requirements of I.R.C. § 401(a) in order to be qualified under Pennsylvania law, its decision was, in substance, based upon two IRS determinations that the Plan was tax qualified. Consequently, it appears that First Options, the bankruptcy court and this Court agree that the Plan should be tax qualified in order to be exempt from the bankruptcy estate.

■ In concluding that the plan should be tax qualified in order to exempt, we must now consider whether the plan is indeed tax qualified and thereby excluded from the estate. To make that determination, we, like the bankruptcy court, consider it wise to defer to the IRS.

It is critical to keep in mind that the IRS did approve this plan and issued letters of determination, not just once but twice. This fact cannot be discounted. See, Amato v. Western Union International, 773 F.2d 1402, 1412–1413 (2d Cir.1985). (Although written "determination letters" by Internal Revenue Service may not be used or cited as precedent, ... [t]hey are entitled to some weight

---

**10.** Section 401(a) of the IRC contains the requirements that must be met for a pension plan to achieve tax qualified status.

**11.** The debtor attached to his brief a paper prepared for the Pennsylvania Senate Judiciary

Committee by its counsel which indicates that the broad language of § 8124(b)(1)(ix) was intended to alter a current judicial trend holding that ERISA superseded state exemption laws with respect to pension plans.

and force of determination letters is enhanced by limited circumstances in which IRS issues them.)

As stated in *In re Youngblood,* 29 F.3d 225, 228 (5th Cir.1994), "The IRS, has been entrusted with the task of implementing the Internal Revenue Code, has adopted extensive rules and regulations governing income tax in general, and the taxability of pension plans in particular."

■ In *Youngblood,* the Fifth Circuit considered whether a bankruptcy court had erred in independently finding that a pension was not qualified under federal tax law, under Texas state law, despite the fact that the IRS had specifically found the plan to be qualified. In reversing the bankruptcy court and district court's holding the Fifth Circuit commented:

> We are persuaded that the legislature intended for its own state courts (or bankruptcy courts applying Texas law) to defer to the IRS in determining whether a retirement plan is "qualified" under the Internal Revenue Code. We see no reason that the legislature would want its courts, which are inexperienced in federal tax matter, to second-guess the IRS in such a complex, specialized area. We find it much more reasonable to assume that the legislature contemplated creating an exemption from seizure for a debtor's retirement funds that could be simply and readily determined by referring to the federal tax treatment of those funds. Moreover, we do not believe that the legislature wanted to adopt a scheme that invites frequent, unseemly, conflicting decisions between the state court or bankruptcy court, and the IRS, such as occurred in this case.

*Youngblood,* 29 F.3d at 229.

We conclude that the rationale employed by the Fifth Circuit in *Youngblood* is both sound and applicable to this case. Disqualification is a drastic remedy and a last resort. The IRS itself offers less extreme solutions for violations of the qualification standards, such as the Voluntary Compliance Resolution Program (VCR).[12]

■ In this case, as the bankruptcy court noted, the IRS has not taken any action, and has not disallowed any tax benefit to the Debtor or to Becker because of the operation of the Plan. This is true despite the fact that all required tax returns and actuarial reviews have been filed on behalf of the Plan. Thus, the IRS has all the relevant information if it chooses to review the Plan.

Moreover, as the bankruptcy court observed, the infraction that First Options contends constituted such a flagrant violation of the IRC involved an excessive distribution to Becker, not to the debtor. That distribution was the result of adversarial negotiations between the Debtor and Becker. *Kaplan,* 162 B.R. at 698. This Court recognizes the Bankruptcy Court's concerns of the inherent unfairness of severely penalizing the Debtor for an excessive distribution which in no way benefitted him.

Finally, it is important to remember that First Options bears the burden of proof on issues relating to its objections to exemptions. Bankruptcy Rule 4003(c). We conclude that there is simply not enough evidence to support its objection to to the debtor's claimed exemption based upon the contention that the Plan should be disqualified. The Bankruptcy Court's denial of the objection to the exemption of the pension plan is upheld, barring subsequent disqualification of the Plan by the IRS.

### 2. Exemption of the New Jersey Property

■ Utilizing New Jersey law, the bankruptcy court sustained First Options' objection to the debtor's claimed exemption under 11 U.S.C. § 522(b)(2) of two New Jersey condominiums which the Debtor owned with his spouse in tenancy by the entireties. Under New Jersey law, the creditor of one spouse is not prevented from reaching that spouse's interest in the entireties property. *In re Youmans,* 117 B.R. 113 (Bankr.D.N.J.

---

12. This program enables plan participants to cure operational defects without the penalty of disqualification. 6 *Pension Plan Guide (CCH),* ¶ 26,422. Under VCR, the sponsor of the plan pays a filing fee once compliance is achieved.

1990). In contrast, under Pennsylvania law, property held by the entireties is exempt from the claims of creditors of only one spouse. *See, In re Leretsis,* 100 B.R. 757, 759 (W.D.Pa.1989); *In re Fisher,* 27 B.R. 71, 72 (Bankr.M.D.Pa.1983).

■ The debtor does not dispute the bankruptcy court's interpretation of New Jersey law, but rather challenges the Bankruptcy Court's decision to apply the law of New Jersey, rather than Pennsylvania, in determining whether the property is exempt. Based on an objective analysis of the competing interests of the two states, the debtor contends that Pennsylvania possesses the dominant interest. This contention, however, lacks support.

■ This Court concludes that the bankruptcy court was correct in applying the law of the state where the property is located. In considering issues pertaining to exemptions of real property, the applicable state law is the law of the state in which the property is located. *In re Lewis,* 64 B.R. 415, 416–17 (Bankr.E.D.Pa.1986), aff'd 85 B.R. 719 (E.D.Pa.1988), rev'd on other grounds, 875 F.2d 53 (3rd Cir.1989). In the instant case, since the property is located in New Jersey, New Jersey law applies. Under New Jersey law, the debtor's exemptions of the condominiums would not be granted, as the Bankruptcy Court concluded. The objection by First Options to the exemption of the entireties property located in New Jersey is upheld.

## III. *THE DISCHARGEABILITY ISSUE*

### A. *Pertinent Facts and Procedural History*

The pertinent facts, as found by the bankruptcy court and as alleged in the filings, are

as follows. The contractual relationship between the Debtor and First Options stems from a Market Maker's Agreement which arose on June 1, 1987, when Kaplan, on behalf of MKI, signed an agreement promising First Options that, "[a]ll securities and other property of the undersigned which you may be carrying for the undersigned, or which may at any time be in your possession or under your control, shall be subject to a general lien and security interest in your favor for the discharge of all the undersigned's indebtedness and other obligation to you."

As a result of the terrible losses MKI suffered in the stock market crash of October 19, 1987, MKI's balance in First Options' account was transformed from a credit of $10,500,000 into a deficit of $2,000,000. In accordance with the terms of the market agreement, First Options then took control of MKI's account and began liquidating the positions of MKI's trading account. Despite these taken steps by First Options, the debt continued to grow.

Following the crash, the Debtor wrote a series of checks against MKI's corporate checking account at Commerce Bank in Philadelphia, Pennsylvania, without prior notice to First Options. The parties stipulate that between October 19, 1987 and December 18, 1987, a period during which MKI's liabilities exceeded its assets, the Debtor withdrew $611,300 from the corporate checking account.[13]

On or about November 4, 1987, contemporaneous with these withdrawals, the parties began negotiating a work-out agreement. Although the parties concluded a "handshake deal" in November, no agreement was actually signed until March 24, 1988. The purpose of this agreement was to resurrect the once

13.

| DATE | PAYEE | AMOUNT |
|---|---|---|
| 10/19/87 | CASH | $4000.00 |
| 10/19/87 | M.M. KAPLAN | $95,000.00 |
| 10/21/87 | M.M. KAPLAN | $10,000.00 |
| 10/27/87 | M.M. KAPLAN | $279,300.00 |
| 11/13/87 | M.M. KAPLAN | $1000.00 |
| 11/23/87 | M.M. KAPLAN | $2000.00 |
| 12/18/87 | M.M. KAPLAN | $30,000.00 |
| 12/18/87 | M.M. KAPLAN | $190,000.00 |

beneficial relationship First Options and MKI had shared.

The work-out agreement reflected a significant compromise on both sides. MKI and the Debtor contested the purported debt in MKI's account, alleging that First Options' actions following the crash had exacerbated the deficit in the account. In order to get back into business, however, and in exchange for certain releases, MKI and the Debtor (i) immediately paid to First Options $80,000; (ii) immediately transferred to First Options ownership of five memberships on the Exchange, worth a total of $570,000; and (iii) acknowledged, on behalf of MKI, the existence and amount of the debt to First Options in the amount of $5,176,953.00 for purposes of the work-out agreement. In addition, MKI agreed to make specific payments, including an assignment of the Debtor's anticipated joint marital tax refunds, to First Options.

In exchange for these concessions, First Options promised to grant MKI access to a trading account of $900,000. Moreover, the agreement provided for a release of Kaplan's personal liability on the accrued deficit. Notwithstanding this release, however, the language of the provision required that the Debtor comply with the terms of the new agreement. Stated another way, Debtor, although fully released from the prior obligation, was not released from complete performance of the provisions of the work-out agreement, which, in essence, became a *substituted obligation.*[14]

MKI's comeback, however, proved ill-fated; it continued to suffer financial hardship, losing an additional $1.5 million. When the inevitable default on its debt to First Options occurred, First Options took over the MKI trading account and liquidated all positions, yielding a final deficit of about $65,000.

In June, 1989, after First Options demands for payment went unsatisfied, First Options sought relief by initiating an arbitration proceeding with the Philadelphia Stock Exchange (PSX). The PSX rendered judgment in favor of First Options and against MKI and the Debtor for an amount in excess of $5.6 million. In addition, a judgment was entered against the Debtor and his wife for $346,342, based on their failure to turn over their joint income tax return as required in the work-out agreement.

Following the PSX's ruling, the Debtor, his wife and MKI filed a petition in federal district court to vacate the arbitration award. The Honorable Jay C. Waldman, in a September 25, 1992 order, denied the petition in full. Thereafter, Debtor appealed the decision to the Third Circuit Court of Appeals, which reversed, finding that the dispute was not arbitrable. *Kaplan v. First Options,* 19 F.3d 1503 (3rd Cir.1994). The Supreme Court of the United States granted certiorari and affirmed the Third Circuit's reversal of the arbitration award. Justice Breyer stated that the debtor had not agreed to arbitrate arbitrability. "Absent clear and unmistakable" evidence that the parties agreed to arbitrate, the Court should refrain from assuming arbitration is the appropriate forum. *First Options of Chicago, Inc. v. Kaplan and MKI Inc.,* — U.S. —, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). Thus, the judgment in favor of First Options was vacated. On February 2, 1993, while review of the case was pending in the Third Circuit, the Debtor filed his bankruptcy petition and First Options then initiated an adversary proceeding in the bankruptcy court. In Count I of the adver-

---

**14.** The relevant language of the release reads as follows:

You [First Options] and your subsidiaries do hereby forever release, discharge, waive and forgive all actions, causes of action, suits, accounts, reckonings, controversies, damages, claims, demands, costs, expenses and other liabilities of any kind whatsoever, in law or in equity, which you or your subsidiaries may now have, or which you or your subsidiaries ever had, or which their respective successors or assigns hereinafter ever may have against Mr. Kaplan ... for, upon or by reason of any activities relating to the total indebtedness, including the payment, thereof ... or at any time prior to the date of the signing of this agreement; provided, however, you and your subsidiaries do not release Mr. Kaplan ... from complete performance of the terms of this Agreement and other documents contained herein and applicable to [him].

sary complaint, First Options sought to have $611,300 of the Debtor's liability declared nondischargeable under 11 U.S.C. § 523(a)(4) on the ground that the Debtor breached his fiduciary duty, as an officer of an insolvent corporation, to preserve MKI's assets for the benefit of First Options as MKI's creditor. In Count II, First Options sought to have $2.6 million of its debt declared nondischargeable under 11 U.S.C. § 523(a)(6), on the ground that it would have been able to pursue the Debtor for at least this sum had the Debtor not deceptively lulled it into agreeing to the work-out agreement.

On September 13, 1993, Debtor's motion to dismiss for failure to state claims upon which relief could be granted was denied. In addition, the bankruptcy court suggested that First Options file an amended complaint and gave it until September 17 to do so. The court ordered the Debtor to file an Answer by September 22, 1993. First Options took the court's advice and filed an amended complaint which focused solely upon the Debtor's retention of the $611,300 from MKI in late 1987. The amended complaint enumerated three counts, under §§ 523(a)(4), (a)(6), and (a)(2)(A), all seeking to have only the $611,300 portion of the Debtors' indebtedness to First Options declared nondischargeable.[15]

In the answer which was filed on the eve of the trial, September 22, 1993, Debtor raised as an affirmative defense the issue of the validity of the release found in the work-out agreement. At the close of its case, First Options objected to this argument, asserting that the issue of the validity of the release was precluded from further litigation in the bankruptcy proceeding due to the *collateral estoppel* effect of the two prior judgments. First Options also objected on the record to the use of the release as a defense, further asserting that it was not prepared to litigate the validity of the release. First Options did not, however, seek a continuance in order to prepare to address the issue of the release. Counsel for First Options made reference to "four or five witnesses" who could address the release issue, but did not specifically offer any proof as to what role these witnesses could play in litigating the release

issue. Rather, counsel for First Options relied primarily upon the contention that collateral estoppel barred any litigation in the bankruptcy proceeding of the release issue. Although the bankruptcy court declined to rule on the collateral estoppel issue at the time of the trial, he did allow the parties to file post-trial briefs on the issue.

The bankruptcy court ultimately rejected the collateral estoppel argument and held that the debt was indeed dischargeable based upon two alternative and independent grounds. First, the court ruled that First Options had not established a basis for nondischargeability under any of the three subsections of § 523, including § 523(a)(4). Second, the bankruptcy court ruled that even if the debt would have been rendered nondischargeable by the conduct of the Debtor which originally gave rise to his obligation to First Options, that original debt had been superseded by the work-out agreement which expressly released Debtor from liability for pre-agreement conduct.

## B. DISCUSSION

 Dischargeability reflects the fresh start policy underlying the Bankruptcy Code. 2 Epstein, Nickles, and White, *Bankruptcy*, § 7–16, 1992. Its purpose is to prevent old creditors from going after the debtor's new income. Discharge, however, is not without its limits. Exceptions to discharge have been carved out in order to preclude a dishonest debtor from enjoying the benefits of dischargeability. Such exceptions, however, are construed liberally in favor of the debtor in order to effectuate the fresh start policy. *In re Belfry*, 862 F.2d 661 (8th Cir. 1988).

 We begin our consideration of the dischargeability issue by examining the bankruptcy court's decision with respect to the collateral estoppel argument. We will then consider the effectiveness of the purported release of the Debtor established by the work-out agreement. If the release is valid, further analysis of dischargeability is precluded, since a legitimate release would essentially eliminate the only obligations of

---

**15.** First Options abandoned its arguments under § 523(a)(2)(A) and § 523(a)(6) on appeal.

the Debtor to First Options which could conceivably have fallen within the purview of § 523(a)(4), the only exception to discharge here involved.[16]

### 1. Collateral Estoppel

As stated previously, the bankruptcy court rejected First Options' argument that collateral estoppel, arising from the arbitration award and its subsequent confirmation by Judge Waldman, barred litigation of the validity of the release in the bankruptcy proceeding.

For purposes of this appeal, the collateral estoppel issue is moot. As noted, both the Court of Appeals for the Third Circuit and the Supreme Court held that the PSX arbitration involved an issue which the Debtor had not agreed to arbitrate. Hence, the arbitration award was vacated, and, therefore, no longer exists. Under such circumstances, it is obvious that the arbitration award can have no collateral estoppel effect on the present proceedings. Thus, the substance of the bankruptcy court's decision on this matter need not be addressed.

### 2. The Release

The bankruptcy court examined the language of the release and found that it unequivocally eliminated all of the claims which First Options had against the Debtor prior to the execution of the work-out agreement and replaced them with the work-out as the sole obligation. Thus, the bankruptcy court viewed the work-out agreement as a novation of the Debtor's prior obligations to First Options and concluded, therefore, that the original debt was no longer subject to

discharge—or the exceptions thereto—since it had been superseded by the obligations imposed upon the Debtor by the work-out agreement.

Where it appears that a note was given and received as payment or waiver of the original debt and the parties agreed that the note was to substitute a new obligation for the old, the note fully discharges the original debt, and the nondischargeability of the original debt does not affect the dischargeability of the obligation under the note. *See, In re West,* 22 F.3d 775 (7th Cir.1994); *Maryland Casualty Co. v. Cushing,* 171 F.2d 257 (7th Cir.1948).

Under Pennsylvania law, unambiguous writings are interpreted by the court as a matter of law. *Mellon Bank, N.A. v. Aetna Business Credit,* 619 F.2d 1001 (3rd Cir.1980). "Unmistakenly clear" language contained in releases negotiated by commercial parties with substantially equal bargaining power should be construed to mean what it says. *Ingram Corp. v. J. Ray McDermott & Co. Inc.,* 698 F.2d 1295, 1312 (5th Cir. 1983). "A Court is entitled to take words spoken so clearly in their ordinary and plain sense." *Id.*

Turning to the relevant language of the release here involved, it appears on its face to be clear and unambiguous. (*See,* n. 14, *supra* for the relevant language of the release). The language does not indicate that any conditions must be met in order for the release to vest. Likewise, the provision does not begin with "upon condition of performance" or similar language which would establish a conditional release.[17] The only ex-

---

**16.** Section 523(a)(4) of the Bankruptcy Code renders nondischargeable any debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny.

First Options focuses upon the fraud or defalcation while acting in a fiduciary capacity portion of § 523(a)(4). Essentially, in order to find a debt nondischargeable, under § 523(a)(4), the debtor must first be found to be a fiduciary by way of either an express or technical trust. This exception may not be extended to trusts *ex maleficio,* which might be imposed due to the wrongful conduct from which the debt arose. *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *Eckel v. Borbidge,* 90 B.R. 728, 733–34 (Bankr.E.D.Pa.1988), *affirmed,* 114

B.R. 63 (E.D.Pa.1990). Stated differently, for purposes of § 523(a)(4), a fiduciary relationship must have existed prior to the creation of the debt. *In re Shervin,* 112 B.R. 724, 731 (Bankr. E.D.Pa.1990).

**17.** Such language was, however, present in MKI's release, which conditioned release of liability on the performance of MKI's obligations under the work-out agreement:

*Upon termination of this Agreement, the release of or payment in full of the Subordinated Notes and other valuable consideration, receipt and sufficiency of which is hereby acknowledged,* you and your subsidiaries do hereby forever release, discharge, waive and forgive all manner of actions,

ception to a complete release is found in the last sentence which reads as follows:

> [P]rovided, however, you and your subsidiaries do not release Mr. Kaplan ... from complete performance of the terms of this Agreement and other documents contained therein and applicable to them.

Work-out agreement, p. 13.

■■■■ The purpose of this exception is simply to prevent the Debtor from walking off with no further obligations and leaving First Options with no means to enforce compliance with the terms of the work-out agreement. This language acts as a substituted obligation, replacing the previous liability of the Debtor with the liability created by the terms of the new agreement. It does not make the release of the Debtor's prior debts *conditional* upon compliance with the terms of the work-out agreement. The release of the Debtor's pre-existing obligations, *i.e.*, indebtedness incurred "at any time prior to the date of the signing of this Agreement," is unconditional, and an unconditional release should be enforced unconditionally. *Ingram Corp. v. J. Ray McDermott & Co.*, 698 F.2d 1295 (5th Cir.1983); *Locafrance U.S. v. Intermodal Systems Leasing, Inc.*, 558 F.2d 1113, 1114 (2nd Cir.1977) (Release "plainly does not require that the agreement be performed before the release becomes effective").

■■■■ When a novation has occurred, *i.e.*, the substitution of a new obligation for a prior obligation, only the new promise is enforceable and the pre-existing claim cannot be revived in the event of a breach. *Nernberg & Laffey v. Patterson*, 411 Pa.Super. 417, 422, 601 A.2d 1237 (1991); *Owen Healthcare, Inc. v. Franklin Square Hospital*, 159 B.R. 453, 456 n. 2 (E.D.Pa.1993). Thus, in the present case, if the Debtor fails to comply completely with the terms of the new agreement, such failure would not defeat the

effectiveness of the release. Rather, because it is unconditional, the release contained in the work-out agreement would remain effective. First Options could, however, enforce performance of the substituted obligation likewise found in the work-out agreement.

■■■■ Under Pennsylvania law, a signed release is binding upon the parties unless executed and procured through fraud, duress, accident, or mutual mistake. *Three Rivers Motors Co. v. Ford Motor Co.*, 522 F.2d 885, 896 (3rd Cir.1975). The natural and ordinary meaning of the release demonstrates the intention of the parties and will prevail unless one of the parties unequivocally proves that the release is invalid. *Sears Roebuck & Co. v. Jardel Co.*, 421 F.2d 1048, 1054 (3rd Cir.1970).

With respect to the instant release, the bankruptcy court observed that the negotiations took place over several months and that both parties were in equivalent bargaining positions and were represented by counsel.[18] *Kaplan*, 162 B.R. 684, 707 (Bankr.E.D.1993). These circumstances indicate that both parties were well equipped to formulate an agreement that would accurately represent their own intentions. There is little likelihood that either party would have succumbed to any sort of fraud or duress.

In light of the sophistication of the parties and their counsel, it seems that the observations of the court in the *Ingram* case are relevant to the present case:

> In this case, we are buttressed in our decision by the omnipresence of high level executives and competent counsel throughout the entire business activities. The settlement of the many controversies between these parties was no fly-by-night transaction. After months of wrangling and negotiating the executives of Ingram and McDermott exchanged letters outlining

---

causes, causes of action, suits, accounts, reckonings, controversies, damages, claims, demands, costs, expenses and other liabilities of any kind whatsoever, in law or in equity, which you or your subsidiaries ever had, or which shall respective successors or assigns, hereafter ever shall or may have against MKI and Duck, and their respective successors, and assigns, for upon or by reason of any activities relating to the Total

Indebtedness ... on or at any time prior to the date of the signing of this Agreement. (Debtor's Ex. 1, at pg. 12–13, paragraph 11). (emphasis added).

18. First Options was represented by several First Options executives, including its chairman Mr. Seidman, and a staff of in-house Continental Illinois attorneys.

proposed settlement terms. This was followed by the formal releases which were drafted by the parties through their skilled and knowledgeable counsel. As the records of this Court reflect, these counsel were not novices at important litigation which must have included experience in contract drafting.

698 F.2d at 1312.

■■■ First Options contends that it was deprived of procedural safeguards in the bankruptcy court litigation of the release in that it was denied the opportunity to present evidence regarding the release. It appears to this Court, however, that First Options *chose* not to substantively address the proper interpretation of the release, choosing instead to rely solely on the collateral estoppel argument.

The bankruptcy court granted First Options the opportunity to file a posttrial brief, in which it could have addressed the release issue. Although First Options did file such a brief, it argued only the collateral estoppel issue and failed to offer any real, substantive proof concerning the release itself or the circumstances surrounding the negotiation thereof. Since the collateral estoppel issue was obviously not clear cut,[19] it would have been wise for First Options to address, as well, any evidence indicating the invalidity of the release, such as evidence of fraud or duress. In the First Options brief, however, there was no mention of the four or five witnesses to which counsel for First Options had alluded during the bankruptcy court proceeding. Moreover, it is questionable how important these "witnesses" were if they did not testify at the arbitration hearing. None of the First Options personnel who were involved in the work-out negotiations were called to testify at the arbitrations hearing.

We conclude that First Options' failure to address these issues in their posttrial brief, and its decision to rely solely on the hope that the bankruptcy court would find collateral estoppel, constitutes a waiver of any claim of error on appeal arising from the bankruptcy court's decision to proceed with the trial despite First Options' claim that it had insufficient opportunity to present evidence concerning the release.

■■■ Finally, the record indicates that the bankruptcy court considered the release a "legal issue anyway." (Transcript at 110). Such determination precludes the use of evidence in interpreting the release. When a written contract is clear and unequivocal, its meaning must be determined by its contents alone. *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1010 (3rd Cir. 1980). In ruling on the release issue, the bankruptcy court relied on the plain language of the release, and considered no testimonial evidence. Since this Court agrees that the language of the release is clear and unambiguous, and, therefore, must be interpreted as a matter of law, there was no cognizable prejudice to First Options arising from the bankruptcy court procedures.

### C. Summary

We conclude that it is presently unnecessary to review the bankruptcy court's decision with respect to the collateral estoppel effect of the PSX arbitration award on the further litigation of the validity of the release found in the March, 1988, work-out agreement between the Debtor and First Options. Consideration of the substance of the collateral estoppel issue on this appeal from the bankruptcy court was rendered moot by the decision of the Supreme Court that Court of Appeals properly vacated the arbitration award in favor of First Options.

We further conclude that the bankruptcy court correctly held that the release found in the work-out agreement between the Debtor and First Options served as a novation and thereby relieved the Debtor of liabilities which arose prior to the work-out agreement, including the $610,300 worth of transfers that First Options contends violated § 523(a)(4). Consequently, we likewise agree that it was unnecessary to consider the substance of

---

**19.** This should have been apparent to First Options from the nature of Judge Scholl's comments regarding the issue during the trial. The court stated, "if it isn't res judicata, it isn't collateral estoppel, then you had no reason not to bring in your witness, quite frankly." (record, pg. 63–64).

First Options' arguments concerning the applicability of § 523(a)(4) to such transfers, since any nondischargeable debt which may have arisen from the Debtor's conduct was superseded by the work-out agreement.

Finally, we note that although the Debtor's original liability has been supplanted by the work-out agreement, the obligations emanating from the work-out agreement remain.

## IV. CONCLUSION

In light of the foregoing it is our conclusion that the bankruptcy court's order upholding the exemption of the pension plan is to be affirmed. Furthermore, as to the exemption of the New Jersey property, the bankruptcy court's order denying the exemption is hereby affirmed.

With regard to the Dischargeability issue, it is our conclusion that no portions of the obligations of the Debtor to Options are to be found nondischargeable, thereby affirming the order of the bankruptcy court declaring the Debtor's liabilities dischargeable.

An Order consistent with our conclusions reached in all of the foregoing discussions will be entered.