In re Victor DESIDERIO, Debtor.

**PENNSYLVANIA MANUFACTURERS' ASSOCIATION INSURANCE COMPANY, Plaintiff,**

v.

**Victor A. DESIDERIO, Defendant.**

Bankruptcy No. 97–104532DAS.
Adversary No. 97–0373DAS.

United States Bankruptcy Court, E.D. Pennsylvania.

Oct. 2, 1997.

Michael J. Rutenberg, Philadelphia, PA, for Debtor.

Stephen Gartner, PMA Insurance Company, King of Prussia, PA, for Plaintiff.

Christine C. Shubert, Tabernacle, NJ, Trustee.

Frederic Baker, Ass't. U.S. Trustee, Philadelphia, PA, U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

The instant proceeding ("the Proceeding") is an action by PENNSYLVANIA MANUFACTURERS' ASSOCIATION INSURANCE COMPANY ("PMA"), an insurer challenging the discharge of an alleged indebtedness to it of VICTOR AGENCY, INC. ("Victor"), its corporate broker, instituted in the Chapter 7 bankruptcy case of VICTOR A. DESIDERIO ("the Debtor"), the president of Victor, pursuant to, ultimately, 11 U.S.C. § 523(a)(4) exclusively. We hold that PMA has failed to prove any indebtedness of Victor to it. Therefore, we need not decide the more difficult issues of whether Victor or the Debtor are " § 523(a)(4) fiduciaries" of PMA such that the Debtor's potential "defalcations" could be declared nondischargeable in the Proceeding.

## B. PROCEDURAL AND FACTUAL HISTORY

The Debtor filed the underlying voluntary individual Chapter 7 bankruptcy case on January 13, 1997. On April 22, 1997, the deadline for doing so, PMA filed a "Complaint to Determine Dischargeability of Debt Pursuant to 11 U.S.C. Section 523" ("the Complaint"). A trial date was set for June 3, 1997, although it was continued to August 7, 1997, by agreement of the parties, with no further continuances to be allowed.

On June 12, 1997, when confronted with the only other matter out of the ordinary arising in this case, we filed an Opinion published at 209 B.R. 342, denying a motion by other insurers, collectively referenced as "Wausau," to extend the date for their filing a similar proceeding challenging dischargeability. The Proceeding therefore remains as the only open matter in this case.

The Complaint contains three Counts, invoking 11 U.S.C. §§ 523(a)(2), (a)(4), and (a)(6), respectively. Each prays that an alleged indebtedness of the Debtor to PMA in the amount of $65,517.67 be declared nondischargeable.

The parties stipulated, before commencement of the August 7, 1997, trial, that the Debtor was the president of Victor; its sole shareholder, officer, and director; and the only individual who could sign checks on its behalf. A trial of about three and a half hours ensued. PMA called four witnesses, Christopher Detullio, the custodian of records of Victor's Bank; Joan Risolia, the office manager of Staffieri, Inc. and Philadelphia Construction and Equipment Corporation (collectively "Staffieri"), one of Victor's customers; most prominently, Joseph Hennessy, PMA's Accounts Receivable Representative; and Joseph Bradley, a PMA underwriter. The Debtor testified relatively briefly in his defense.

We found PMA's trial presentation somewhat unfocused, and therefore we requested post-trial briefing from PMA and the Debtor, to be filed by September 5, 1997, and September 15, 1997, respectively. With the consent of PMA, the Debtor's submission was delayed until September 18, 1997. In its post-trial submission, PMA confined its claims to § 523(a)(4) and identified three potential "defalcations" subject to this Code section.

The first, around which the bulk of the testimony revolved, related to a $67,021.00 credit which was taken by Victor in August 1994, in reference to a worker's compensation policy on which the insured was Hope Imaging Corp. ("Hope"). Victor based its calculation of Hope's credit upon an "experience modification number" of 1.00, when in fact the number at the time for Hope was allegedly 1.424. This discrepancy was the root of the disparity between PMA's computation of the credit as $33,665.00 and Victor's calculation of a $67,021.00 credit.

The Debtor testified that he believed that the credit was appropriate because Hope had sold or otherwise transferred its assets to Kreonite, Inc. ("Kreonite"), thereby eliminating Hope's adverse rating. Moreover, although he never admitted that Victor's calculations were correct, Hennessy conceded that Hope/Kreonite's "experience modification factor" reverted to 1.00 in March 1995, retroactive to the beginning of the policy. Although both he and Bradley contended that Hope/Kreonite's credit was less than the $67,021 allowed by Victor, they were unable to quantify any monetary loss to PMA as a result of this transaction.

The second alleged defalcation involved transactions of Victor in fall of 1994, shortly before it filed bankruptcy. PMA presented evidence that, at that time, several checks were sent to Victor by Staffieri, totalling over $55,000, which did not coincide with Victor's remittances to PMA. Also, Hennessy noted that checks remitted by the Debtor to PMA on September 14, 1994, and October 18, 1994, in the amounts of $49,926.61 and $1,814.24, respectively, were returned as uncollectible. PMA contends that the Staffieri checks were submitted to Victor as current premium payments and as such Victor should have been remitted to PMA the same amounts that it received from Staffieri. Since it never received payments in these amounts, PMA alleges defalcation on the part of Victor. PMA also states that, while the checks written to its order by Victor in September and October

1994 were covered by later funds, Victor's actions in initially sending it bad checks nevertheless constituted defalcations.

With respect to the Staffieri checks, the Debtor responded that Staffieri submitted these checks to Victor as reimbursement for premiums that Victor had previously advanced on Staffieri's behalf. PMA's own witness, Staffieri employee Risolia, confirmed the Debtor's testimony regarding this procedure, thereby verifying advancements by Victor and later reimbursements by Staffieri as a normal practice between the two.

PMA contended that this practice was not proper, but was unable to cite an applicable provision of its Debtor's Broker Agreement which was violated. Hennessy referenced a provision, ¶ 3.4(5) of the Broker Agreement, which required that "credit transactions must be taken in the applicable reporting period." However, this Article addresses the "Company Account Current Procedure," and appears to be inapplicable to brokers working on a "statement account" with PMA, like Victor. We decline Hennessy's attempts to claim that this paragraph applied to Victor or that it necessarily precluded brokers from paying premiums in advance of receiving payments for premiums from insureds. In any·event, both the Debtor and Risolia testified that such a procedure, whether proper or not, was practiced by them both. Further, Risolia presented no testimony that Staffieri's insurance coverage had ever lapsed, or any dissatisfaction whatsoever with Victor's service of its accounts.

With respect to the bad checks, the Debtor attributed the September 1994 occurrence to an error by his bank, which was changing ownership, and not to any negligence on his part. He attributed the October 1994 occurrence to Victor's closing of its prior bank account as a requirement in the course of Victor's Chapter 11 bankruptcy proceedings.

The third alleged defalcation referenced a $9,198.00 payment made by Staffieri to Victor in September 1995. Relevant to this claim, we note that, in late 1994, at the Debtor's request in light of Victor's bankruptcy filing, PMA commenced its own direct collection of its premiums from the insureds serviced by Victor. The Debtor admitted that Victor received this check directly from Staffieri, despite the direct collection procedure, and that Victor did not remit the proceeds to PMA. The Debtor further explained that he was involved in a serious automobile accident on August 22, 1995, which left him hospitalized, infirm, and under heavy medication at the time of receipt of this check. As a result, he testified that he was unaware of this payment. Again, Risolia made no claim of a break in its PMA insurance coverage or improper receipt of this sum by Victor.

## C. DISCUSSION

### 1. *It Is Unclear Whether the Individual Debtor Was a § 523(a)(4) Fiduciary of PMA.*

PMA has presently confined its challenge to the dischargeability of the Debtor's alleged obligations to it to 11 U.S.C. § 523(a)(4), which provides as follows:

(a) A discharge under section 727 of this title does not discharge an individual debtor from any debt—

. . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny; . . .

PMA has further confined its claims to the "defalcation" prong of this Code section.

■ It is well-established in the caselaw interpreting the § 523(a)(4) defalcation prong, as stated by this court in *In re Kaplan,* 162 B.R. 684, 704 (Bankr.E.D.Pa.1993), *aff'd sub nom. Kaplan v. First Options of Chicago, Inc.,* 189 B.R. 882 (E.D.Pa.), *reconsideration denied sub nom. First Options of Chicago, Inc. v. Kaplan,* 198 B.R. 91 (E.D.Pa.1996), that the term "fiduciary capacity" is very narrowly defined. Thus, we stated, at *id.,* that,

to give rise to § 523(a)(4) liability, it is not sufficient for the plaintiff to prove only that there was a fiduciary relationship between the parties, but also to prove that there is an express trust held by the fiduciary (debtor) on behalf of the beneficiary (creditor), which did not arise out of the action that created the fiduciary relation-

ship. *See In re Spector,* 133 B.R. 733, 739–40 (Bankr.E.D.Pa.1991) (holding that the "fraud or defalcation" prong of § 523(a)(4) requires the showing of an express trust); *In re Shervin,* 112 B.R. 724, 730–31 (Bankr.E.D.Pa.1990); and *In re Snyder,* 101 B.R. 822, 835 (Bankr.D.Mass.1989), *aff'd in part & rev'd in part on other grounds sub nom. Snyder v. Bornstein,* 923 F.2d 840 (1st Cir.1990).

■ In order to establish the requisite "express trust," we stated in *Kaplan* that the § 523(a)(4) plaintiff is required to prove the presence of

> [t]he prerequisites for the creation of an express trust relationship under Pennsylvania law [which] are, as we thusly held in *In re Kulzer Roofing, Inc.,* 139 B.R. 132, 139–40 (Bankr.E.D.Pa.), *aff'd,* 150 B.R. 134 (E.D.Pa.1992), quite demanding:
>
>> "The elements of an express trust, as developed by Pennsylvania case law, are (1) an express intent to create a trust; (2) an ascertainable *res;* (3) a sufficiently certain beneficiary; and (4) a trustee who 'owns' and administers the *res* for the benefit of another (the beneficiary). *See In re Penn Central Transportation Co.,* 486 F.2d 519, 524 (3d Cir.1973), *cert. denied sub nom. Baker v. Indiana H.B. R.R.,* 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974) (*"Penn Central I"*);*Sherwin* [*v. Oil City Nat'l Bank,*] ... 229 F.2d [835], at 838, 839 [ (3rd Cir.1956) ]; *In re I.D. Craig Service Corp.,* 125 B.R. 453, 456 (Bankr.W.D.Pa. 1991); *In re CS Associates,* 121 B.R. 942, 959 (Bankr.E.D.Pa.1990); *In re Shervin,* 112 B.R. 724, 734 (Bankr. E.D.Pa.1990); and *Presbytery of Beaver–Butler United Presbyterian Church v. Middlesex Presbyterian Church,* 507 Pa. 255, 268–69, 489 A.2d 1317, 1324, *cert. denied,* 474 U.S. 887, 106 S.Ct. 198, 88 L.Ed.2d 167 (1985) .... the absence of *any* of the express trust elements to be present is fatal to the contention that a trust exists, ..."
>
> *See also e.g., Thompson's Will,* 416 Pa. 249, 254–55, 206 A.2d 21, 25 (1965).

*Id.* at 705. *See also, e.g., In re Librandi,* 183 B.R. 379, 382–86 (M.D.Pa.1995); and *In re Napoli,* 82 B.R. 378, 381–82 (Bankr.E.D.Pa. 1988).

In arguing that the requisite "express trust" is present here, PMA cites two sources, 40 P.S. § 273.1 and the Broker Agreement between PMA and Victor. The statute provides as follows:

> Every insurance agent and broker, acting as such in this Commonwealth, shall be responsible in a fiduciary capacity for all funds received or collected as insurance agent or broker and shall not, without the express consent of his or its principal, mingle any such funds with his or its own funds or with funds held by him or it in any the capacity. Nothing herein contained shall be deemed to require any such agent or broker to maintain a separate bank deposit for the funds of each such principal, if and as long as the funds so held for each such principal are reasonably ascertainable from the books of account and records of such agent or broker.

The most pertinent provision of the Broker Agreement appears to be Article 3, ¶s 3.1 and 3.2, which read as follows:

> 3.1. Unless released in writing by the Company, the Broker shall hold in trust all premiums and other monies received by the Broker pursuant to the authority granted by this Agreement in a separate trust account until delivered to Company and Broker shall not commingle such monies with Broker's own funds. The privilege of deducting commission from premium monies received by the Broker shall not be construed to alter this provision.
>
> 3.2. The Broker shall be responsible for all earned premiums, whether original, renewal, installment or other business written by the Broker and placed with the Company....

PMA must clear two hurdles to establish that the Debtor is a § 523(a)(4) fiduciary as to any liabilities for premiums which it was proven had been collected from insureds but not remitted to PMA. First, it must establish that Victor, as trustee, holds premiums collected in an express trust for PMA as its beneficiary. And, second, it must attribute Victor's trustee status to the individual Debt-

or. We must express some doubt as to whether, assuming *arguendo* that PMA had proven that Victor "defalcated" by collecting premiums from insureds and not forwarding them to PMA, both of these requirements could be met.

PMA references the decisions of Judge Twardowski and Judge Fox of this court in *In re Manzo*, 106 B.R. 69, 72 (Bankr.E.D.Pa. 1989); and *In re James*, 94 B.R. 350, 353 (Bankr.E.D.Pa.1988), respectively, in support of its argument that such options constitute conduct within the scope of § 523(a)(4). *James* holds that 40 P.S. § 273.1, combined with proof that an insurance agent accepted money from a plaintiff insured which was not utilized to purchase insurance, rendered the agent a § 523(a)(4) fiduciary as to an insured. We note, however, that Judge Fox allows only that this statute "appears to violate a specific obligation on the part of the defendant as to the premiums paid by the plaintiffs." *Id.*

*Manzo* involved an insurance agency whose debtor-president extended a personal guaranty to indemnify the plaintiff insurer from losses it might sustain from the parties' relationship, 106 B.R. at 71, which losses the court found totalled $53,000. Without extended analysis the court contends that 40 P.S. § 273.1 creates a § 523(a)(4) relationship. *Id.* at 72.

In *James*, there was no question that the business of the debtor, who operated his insurance agency as a sole proprietor, received premiums from an insured and failed to remit them to an insurer, thus resulting in a loss of coverage to the plaintiffs. *Id.* at 351. The loss to the insured resulting from the breach of duty was, therefore, quite clear.

In the instant Proceeding, the plaintiff is not an insured who failed to receive coverage because his premiums were improperly retained by an agent, but an insurer which is unable to quantify any losses due to the Debtor's conduct. Also, the "agent and broker" referred to in the Broker's Agreement is a corporate entity, Victor, not a sole proprietorship giving rise to individual liability as in *James*.

In *Manzo* the agreement at issue apparently referenced only the debtor's corporation. However, the court found that the debtor's status as ninety-five (95%) percent shareholder and president of the corporation, "when combined with the debtor's personal guarantee to plaintiff, and the fact that the debt owed to the plaintiff arose as a result of the failure to account for the [entrusted] settlement funds," rendered a finding of an express trust appropriate. 106 B.R. at 72. Neither a guaranty nor a clear finding of misapplication of funds, has been proven here.

It is not clear that either Judges Fox or Twardowski held, in *James* or *Manzo*, respectively that 40 P.S. § 273.1, in and of itself, creates a § 523(a)(4) fiduciary relationship between an agent and broker and an insurer. We question whether 40 P.S. § 273.1 has this effect, in light of the stringent test for creating such a relationship set forth in *Kaplan, supra.* It is not clear to us that there was an intent to create an express trust relationship between Victor and PMA, either in the instant Broker Agreement or as required as the first element of an express trust under Pennsylvania law. Therefore, it is far from clear to us that any § 523(a)(4) fiduciary relationship existed between PMA and Victor, irrespective of what our brethren may have held in *Manzo* and *James*.

■ Assuming *arguendo* that we found that Victor could be classified as a ·§ 523(a)(4) fiduciary of PMA, an issue which we do not concede, PMA could hold the Debtor personally liable for Victor's defalcation only if it were further able to pierce Victor's corporate veil and hold the Debtor liable for Victor's actions on an *alter ego* theory. As we recently observed in *In re Main. Inc.*, 213 B.R. 67, 88 (Bankr.E.D.Pa. 1997), quoting *Kaplan v. First Options of Chicago, Inc.*, 19 F.3d 1503, 1521 (3d Cir. 1994), *aff'd*, 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995),

"[t]he corporate veil is pierced only when 'the corporation was an artifice and a sham to execute illegitimate purposes and [an] abuse of the corporate fiction and immunity that it carries.' *Wheeling–Pittsburgh*

*Steel Corp. v. Intersteel, Inc.*, 758 F.Supp. 1054, 1058 (W.D.Pa.1990) (citing *Zubik v. Zubik*, 384 F.2d 267 (3d Cir.1967), *cert. denied*, 390 U.S. 988, 88 S.Ct. 1183, 19 L.Ed.2d 1291 (1968)). 'In deciding whether to pierce the corporate veil, courts are basically concerned with determining if equity requires that the shareholders' traditional insulation from personal liability be disregarded and with ascertaining if the corporate form is a sham, constituting the facade for the operations of the dominant shareholder.' *Id.* at 1057 (citing *Carpenters Health & Welfare Fund v. Kenneth R. Ambrose, Inc.*, 727 F.2d 279 (3d Cir. 1983))."

No evidence that Victor was an artifice and a sham to execute illegitimate purposes was proven, nor were such factors as failure to observe corporate finalities, siphoning of funds from Victor to the Debtor, and the absence of corporate records proven. In fact the Debtor testified that Victor was actively and successfully engaged in business since 1977 and that not he but Victor had contracted with PMA for over five years prior to 1994 without incident.

We also note that our decision in *Kaplan, supra*, 162 B.R. at 704–05, questions whether a debtor can be held liable to creditors of an insolvent corporation of which the debtor is a director on the theory that the debtor is a fiduciary of the corporation's creditors under § 523(a)(4). *But see In re Bagel*, 1992 WL 477052, at *12–*20 (Bankr.E.D.Pa.1992), *aff'd*, C.A. No. 93–289 (E.D.Pa. July 21, 1993), *aff'd*, 22 F.3d 300 (3d Cir.1994). There was, in any event, no proof that Victor was insolvent at *any* pertinent time-period.

The Debtor appropriately cites *In re Long*, 774 F.2d 875, 878–79 (8th Cir.1985); and *In re Black*, 179 B.R. 509, 514–15 (Bankr. E.D.Tex.1995), for the principle that a president of a small, closed corporation cannot be assumed to be personally liable for a corporation's breaches of its fiduciary duties. An arguably contrary result in *Manzo* was rendered in light of the debtor's personal guaranty and in the absence of what we believe to be the foregoing necessary analysis. The only other authority cited by PMA, *In re Koszuth*, 43 B.R. 104 (Bankr.M.D.Fla.1984),

merely *denies summary judgment* to an individual debtor whose corporation converted the plaintiff's funds in a § 523(a)(4) claim, while pointing out that "[t]he fiduciary duty imposed upon the debtor must be owed to the claimant" and that "[u]sually there is no fiduciary relation between a creditor and the corporate officer." *Id.* at 108.

We therefore question whether the individual Debtor could be deemed a § 523(a)(4) fiduciary as to any debts proven to be owed by Victor to PMA.

2. *Assuming Arguendo that the Debtor Were a § 523(a)(4) Fiduciary as to such Debts, PMA Has Not Proven that There Are Any Debts Owed to It Due to the Debtor's Conduct.*

Our previous discussion indicates our doubts that PMA has proven that any debt owed to it by Victor could be determined to be nondischargeable by the Debtor under § 523(a)(4). However, for the purposes of rendering our decision, we will assume that any debts owed to PMA by Victor could be declared nondischargeable as to the Debtor under § 523(a)(4). In so stating, we acknowledge that any loss suffered by PMA as a result of Victor's failure to account to PMA for funds paid to it would probably fall within the broad definition of "defalcation." *See, e.g., Quaif v. Johnson*, 4 F.3d 950, 955 (11th Cir.1993); *James, supra*, 94 B.R. at 353–54; and *In re McCormick*, 70 B.R. 49, 51 (Bankr. W.D.Pa.1987). Nevertheless, a necessary element of any claim under § 523(a) is a showing that the debtor is obligated to the creditor for a "debt."

The first, and, given the predominance of the trial time given to this issue, we must assume the most serious, allegation of defalcation at issue involves the $67,021 credit taken by Victor on behalf of its insured Hope in October 1994. At the hearing this court was subject to considerable testimony relative to this issue. Victor based this credit request upon an experience modification factor of 1.000. At the time the correct and applicable figure was 1.424. The Debtor contends, and PMA disputes, that Victor properly requested an appeal for a change in this figure because of Hope's acquisition by

Kreonite. It seems to us that, with respect to whether PMA suffered a loss due to the Debtor's actions, the most important fact is that the experience modification factor for Hope/Kreonite reverted to 1.000 in March 1995 and became retroactive to the beginning of the policy. PMA apparently agrees that the Debtor's initial position may have ultimately been proven correct, but nevertheless contends that this reversion is irrelevant since Victor allegedly "misappropriated" these funds in the interim period.

We find PMA's argument to be unpersuasive. PMA's assertion that Victor effected a defalcation of its funds by requesting a credit that turned out to be correct is counterintuitive. Furthermore, PMA put forth no conclusive proof regarding the amounts that were paid to Victor. The only evidence addressing any possible amount owed to PMA, other than testimony, is an October 1994 statement of Victor detailing the credits at issue as well as other various amounts. Nothing in this statement indicates whether the amount credited on the Hope policy or any of the other relevant amounts were actually received by Victor. PMA thus alleges that the Hope credit was misappropriated, despite that it has not even proven that the Hope credit ever reached Victor. Hence, PMA has not met its burden of proving defalcation as to the $67,021.

PMA's second claim involves various payments made from Staffieri to Victor in 1994. PMA asserts that Victor received a number of premium payments, from June through October 1994, which it failed to remit to PMA. PMA relies upon certain checks entered as exhibits to prove that Victor received the payments at issue from Staffieri. The Debtor, meanwhile, contended that these payments did not represent premium payments but were in fact reimbursements paid to it by Staffieri for premiums previously advanced to it by Victor. PMA's witness Hennessy admitted this to be common procedure, albeit one which he contended was improper. *See* page 102 *supra*. Although the correct application of the checks remains unclear, PMA had the burden of proving that Staffieri's payments were made on account of current premium payments which were not

forwarded to PMA. The fact that Staffieri's witness Risolia did not indicate any lapse of coverage or dissatisfaction with Victor by implication supported the Debtor's testimony in straightforward, unimpassioned testimony, and tends to discredit PMA's hypothesis that improprieties occurred.

PMA's mention of the uncollected September 1994 and October 1994 checks written by Victor to it, the circumstances of which were totally explained as not culpable on his part by the Debtor and which were admittedly properly covered by subsequent remittances, tends to reflect the weakness of its case. No losses are alleged to have occurred due to these transactions.

■ The preponderance of the evidence standard which this court held applies to every element of discharge and dischargeability claim in *In re Blanchard*, 201 B.R. 108, 114 (Bankr.E.D.Pa.1996), requires more than a mere assertion or inference that a defalcation may have occurred must be presented to support a § 523(a)(4) claim. The plaintiff can only meet this burden through a balancing test in which the evidence weighs more heavily on its behalf than on behalf of the debtor opposing same. PMA makes allegations but fails to substantiate them with concrete proof. It does not even claim a specific amount which is owed to it. The Complaint is very specific in alleging an indebtedness to it from Victor of $65,517.57, but this figure is nowhere supported in the record. This figure is, however, in the range of the sum at issue in the totally meritless Hope/Kreonite-related claim.

■ This court cannot declare a disputed and completely unproven debt nondischargeable. Although we do not believe that it is our duty to liquidate dischargeable debts, *see In re Clayton*, 195 B.R. 342, 345–46 (Bankr. E.D.Pa.1996); and *In re Shapiro*, 188 B.R. 140, 149 (Bankr.E.D.Pa.1995), the presence of a debt in some amount must be proven to support a claim of nondischargeability. Proof of any such debt is absent here.

The third and final alleged defalcation involves a check for $9,198 paid to Victor by Staffieri in September 1995. The evidence relating to this payment is very skimpy.

Staffieri made the payment to Victor. Victor did not forward it to PMA. At that time PMA was making direct collections from the insureds. As in the case of the 1994 payments, Risolia articulated no claim of any impropriety regarding this payment, and no testimony suggesting its propriety was adduced from her. On his part, the Debtor testified only that, at the time of this payment, he was hospitalized due to a serious accident. He further stated that the hospitalization and medication prevented him from operating Victor at that time, and therefore he had no personal knowledge of this payment or its purpose.

From the foregoing, it appears probable that this payment represented a final settlement of Staffieri's obligations to repay Victor for premiums advanced on its behalf by Victor. There is no evidence that this payment was due from Victor or Staffieri to PMA for an insurance premium, or that PMA had any right to this sum for any reason. It is therefore impossible to conclude that this payment created a debt owed to PMA by Victor. Thus, as in the prior two incidents of alleged defalcations, no indebtedness of Victor to PMA, and consequently perforce of the Debtor to PMA, has been proven. Consequently, no debt owed by Victor or the Debtor to PMA which could be deemed nondischargeable has been proven.

### D. CONCLUSION

An order rendering judgment in this proceeding in favor of the Debtor will therefore be entered.

### ORDER

AND NOW, this 2nd day of October, 1997, after a trial of the above-captioned proceeding on August 7, 1997, and upon consideration of the parties' post-trial briefs, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in favor of the Debtor–Defendant, VICTOR A. DESIDERIO ("the Debtor"), and against the Plaintiff, PENNSYLVANIA MANUFACTURERS' ASSOCIATION INSURANCE COMPANY ("PMA").

2. Failing to find proof of any indebtedness of the Debtor to PMA on this record, as is necessary to support PMA's claim under 11 U.S.C. § 523(a)(4), any actual indebtedness of the Debtor to PMA is DECLARED dischargeable.