**In re Felicia JOHNSON, Debtor.**

**Woodstock Housing Corporation, Plaintiff,**

**v.**

**Felicia Johnson, Defendant.**

**Bankruptcy No. 99–18833DAS.
Adversary No. 99–0928.**

United States Bankruptcy Court,
E.D. Pennsylvania,
Philadelphia Division.

Dec. 23, 1999.

---

Michael Donahue, Community Legal Services, Inc., Philadelphia, PA, for Debtor.

Jordan D. Cunningham, Harrisburg, PA, for Plaintiff.

Andrew N. Schwartz, Philadelphia, PA, Trustee.

Frederic Baker, Ass't. U.S. Trustee, Philadelphia, PA, United States Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The instant adversary proceeding ("the Proceeding") requires application of 11 U.S.C. §§ 523(a)(2)(A), 523(a)(2)(B), and 523(a)(4) in a factual setting distinct from any cases either the well-represented parties or we ourselves have been able to uncover. FELICIA JOHNSON ("the Debtor") was, at all relative times, a young adult resident of federally-subsided housing in a unit of which her mother was the designated "head of household." In the latter years of the tenancy, the Debtor was elected to the housing development's Board of Directors and served as its Treasurer. The end of the tenancy of the Debtor's household resulted shortly after it was discovered that the household's income, on which the portion of the rent payable by it was computed, had been significantly under-reported for many years.

We find that none of the several statutory bases invoked by WOODSTOCK HOUSING CORPORATION ("the Plaintiff") support the conclusion that the Debtor's particular liability for additional rent, as contrasted with the potential liability of her mother had she been a debtor, is nondischargeable. Basically, the claims all fail due to lack of proof of an intent to deceive on the part of the Debtor and due to the failure of the Plaintiff to prove that it suffered any actual loss or damage due to the misrepresentations made. Also, the Plaintiff failed to prove the issuance of a statement of the Debtor representing her financial condition, as is required under § 523(a)(2)(B). The § 523(a)(4) claim, based on the Debtor's status as the Plaintiff's officer and board member, also fails because the Plaintiff was unable to prove

the requisite link between the Debtor's fiduciary capacity and the alleged frauds.

## B. PROCEDURAL AND FACTUAL HISTORY

The Debtor filed the underlying individual voluntary Chapter 7 bankruptcy case on July 12, 1999. On October 14, 1999, just prior to the October 15, 1999, deadline for filing objections to the Debtor's discharge or the dischargeability of any of her debts, the Plaintiff filed the Proceeding, seeking a determination that the Debtors alleged obligations to it were non-dischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(2)(B), 523(a)(4), and 523(a)(6). The Proceeding is the only significant event in this case, which would otherwise be ready for the entry of a discharge and closing.

The trial of the Proceeding was held on December 2, 1999. At its conclusion, the Plaintiff agreed to file its post-trial submission by December 10, 1999, and the Debtor had by December 17, 1999, to respond. Both were timely filed and served.

Joan Johnson, the Debtor's mother ("the Mother"), entered into an occupancy agreement ("the Lease") with the Plaintiff on July 3, 1986. The Mother was identified in the Lease as the household head or "Member," and the Debtor, then 21 years old and recently having become the mother of the youngest of her three children, was designated as a "family member." The Lease was executed by the Mother only and not the Debtor. There was no evidence that the Debtor ever signed this or any subsequent lease with the Plaintiff.

The Lease set forth a monthly housing charge which the "Member agrees to pay." It further recited that the monthly housing charge "shall be subject to change by reason of changes in the Member's family income."

The Debtor testified that the Mother handled all of the matters involving the Lease, including all of the reporting requirements. She further explained that,

when it was necessary that certain forms, particularly those related to her income, be executed by her, the Mother brought the forms to the Debtor and directed her where to sign. The Debtor claimed that she did not at any time understand the income-certification process, nor was she aware of what the Mother reported to the Plaintiff. All of the annual recertification forms ("50059 Forms") between 1990 and 1994 required by the United States Department of Housing Development ("HUD"), which subsidized the tenants' rents under Section 8 of the United States Housing Act, 42 U.S.C. § 1437f, that were produced by the Plaintiff at trial were signed by the Mother and not by the Debtor.

In March, 1995, Interstate Realty Management Co. became the Plaintiff's management agent and assigned William Canteen to the project as its site manager. Shortly thereafter, Canteen was directed to review all tenants' files. Pursuant thereto, the Debtor was asked to sign a recertification form. That form, dated March 22, 1995, indicated that her annual income was $30,264. This figure greatly exceeded the income previously reported for the Debtor, and led to the discovery of the household's prior income-report misstatements.

The record also contains a June 23, 1995, 50059 Form, signed only by the Mother but to which the Plaintiff attached an undated certification form signed by the Debtor as well as the Mother. That Form disclosed the Debtor's annual income of $12,480. The Debtor stated that she "can't tell" from looking at it whether that form disclosed her income and whether she in fact certified the accuracy of its contents.

The Debtor was elected to the Plaintiff's Board of Directors and served as its Treasurer at some time in 1994 and 1995. However, she testified that those positions gave her no insight into the tenant recertification process and that, as Treasurer, her

only responsibility was to hold and .write checks at the Board President's direction.

The Plaintiff subsequently obtained complete records of the income of the Debtor and the Mother from the Pennsylvania Department of Labor and Industry and computed the difference in the household's proper share of the rent compared to what it actually paid for the period from September, 1990, through December 31, 1995. The Plaintiff determined that the household received excessive house assistance payments ("HAPs") in the total amount of Thirty–Seven Thousand Five Hundred Fifty–One Dollars ($37,551.00) over that period.

The Plaintiff instituted an action against the Debtor and the Mother in state court in May, 1996, to recover possession of the unit occupied by the household and to obtain a judgment for the excess HAPs. In January, 1998, the Johnson household vacated the unit.

Canteen testified that HUD was entitled to be reimbursed by the household for the excess HAPs paid on its behalf. However, Canteen stated that he did not believe that the Plaintiff was liable to pay the excess HAPs to HUD if the Plaintiff was not able to obtain them from the Debtor or the Mother, and there was no indication that any excess HAPs had been recovered by the Plaintiff. The Plaintiff, in its brief, argued that, pursuant to certain HUD transmittals, it was required to reimburse HUD for any HAPs overpaid due to a tenant's submission of incorrect and/or false information, if repayment from the tenant is received. However, it argues that other transmittals state that the owner is "ultimately" responsible to HUD for its overpayment of HAPs.

## C. DISCUSSION

The statutory provisions which the Plaintiff invoked read as follows:

### § 523. Exceptions to discharge

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive;

. . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny; . . .

### 1. The § 523(a)(6) Claim Is Deemed Abandoned.

The Plaintiff filed a comprehensive brief which addressed, at length, its claims asserted under §§ 523(a)(2)(A), (a)(2)(B), and (a)(4) but did not address its claims under § 523(a)(6) at all.

[W]hen a party does not mention nor make any argument during trial or in its post-trial submissions regarding claims asserted in a complaint filed by that party, that party will be deemed to have abandoned or waived those claims which it has not discussed. *In re Kaplan,* 1995 WL 500599, at *13 n. 8 (Bankr.E.D.Pa. Aug. 22, 1995); *In re Cara Corp.,* 148 B.R. 760, 770 (Bankr.E.D.Pa.1992); *In re Henderson,* 134 B.R. 147, 155 (Bankr. E.D.Pa.1991); *In re Lloyd Securities, Inc.,* 1992 WL 165962, at *6 (Bankr. E.D.Pa. July 10, 1992); and *In re Slawek,* 1990 WL 41877, at *7 (Bankr.E.D.Pa.

April 6, 1990). *See also Manton Cork Corp. v. Reiley–Moustakas Development,* 1987 WL 5286 at *12 (E.D.Pa. Jan. 8, 1987) (claim not argued in opening statement, closing statement, nor lengthy post-trial brief is deemed abandoned).

*In re Laramie Associates, Ltd.,* 1997 WL 67848, at *12 (Bankr.E.D.Pa. Feb. 12, 1997).

■ In any event, we find no evidence to support the conclusion that the Debtor intentionally acted to injure the Plaintiff, as it is now established is necessary to support a claim under § 523(a)(6). *See In re Harland,* 235 B.R. 769, 779 (Bankr. E.D.Pa.1999), citing *Kawaauhau v. Geiger,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). Therefore, we will not consider the § 523(a)(6) claim against the Plaintiff any further.

   2.   *The Plaintiff Failed to Prove Most of the Five Elements of a § 523(a)(2)(A) Claim.*

■ Citing *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995); *In re Wong,* 207 B.R. 822, 826 (Bankr.E.D.Pa. 1997); and *In re Segal,* 195 B.R. 325, 331 (Bankr.E.D.Pa.1996), the Plaintiff acknowledges that, to succeed on a claim under § 523(a)(2)(A), it was obliged to prove, by a preponderance of the evidence, that (1) the debtor made a representation to the creditor; (2) the debtor knew the representation was false at the time it was made; (3) the debtor made the representation with the intention and purpose of deceiving the creditor; (4) the creditor justifiably relied on such representation; and (5) the creditor sustained the alleged loss and damage as proximate result of the false representation having been made. *See also In re Fulginiti,* 201 B.R. 730, 733 (Bankr.E.D.Pa.1996); *In re Blanchard,* 201 B.R. 108, 114–15 (Bankr.E.D.Pa.1996); *In re Graham,* 194 B.R. 369, 372 (Bankr. E.D.Pa.1996); *In re Chryst,* 177 B.R. 486, 492 (Bankr.E.D.Pa.1994); *In re McDonald,* 177 B.R. 212, 215 (Bankr.E.D.Pa.

1994); *In re Naimo,* 175 B.R. 878, 881 (Bankr.E.D.Pa.1994), *aff'd,* 1995 WL 163598 (E.D.Pa. April 6, 1995); *In re Bergman,* 103 B.R. 660, 670–71 (Bankr.E.D.Pa. 1989); *In re Woods,* 66 B.R. 984, 988 (Bankr.E.D.Pa.1986); *In re Gelfand,* 47 B.R. 876, 879 (Bankr.E.D.Pa.1985); and *In re Brackin,* 23 B.R. 984, 985 (Bankr. E.D.Pa.1982).

■ The Plaintiff runs into difficulties with proving even the first element. There is simply no evidence that the Debtor, as opposed to the Mother, ever misrepresented her own income, let alone the income of the entire Johnson household.

We note that, citing *Field,* the Plaintiff devotes almost the entire discussion of its § 523(a)(2)(A) claim in its brief to establishing that it "justifiably relied" on the misrepresentations of the household income presented to it. We agree with the Plaintiff that, were the other four elements of a § 523(a)(2)(A) claim proven by a preponderance of the evidence, the absence of "justifiable reliance" would not have served as a defense for the Debtor. However, the Plaintiff's difficulties arise from its inability to prove any of the *other* elements.

We agree with the Plaintiff insofar as it observes that the first three elements require us to assess the Debtor's credibility. However, we found the Debtor to be a credible witness. She delivered all of her denials regarding her knowledge of what the Mother had reported to the Plaintiff in a straightforward manner. At no point was she caught in any inconsistent statements at trial or with any pre-trial discovery. While the Debtor did not display any mental deficiencies, neither did she impress us as a particularly perceptive or inquisitive individual and hence as one who could have been expected to have become aware of the Mother's actions. In sum, we believe it plausible that the Debtor was an innocent and unknowing beneficiary of the Mother's wrongful actions at all pertinent times. There is no reason to have expect-

ed the Debtor to have uncovered this long-standing course of action of the Mother any quicker than did the Plaintiff's management.

A paper trail of certifications allegedly made by the Debtor was not made out by the Plaintiff. Most of the documents bearing her signature were forms verifying her employment (which were all literally true, although they were incomplete because she had other employment) and authorizing the Plaintiff to contact her named employers. The only exceptions to these characterizations of the documents signed by her which we could locate in the record were the following: (1) her undated verification of "Asset Information," none of which was alleged to be false; and (2) her undated certification of a 50095 Form, certified as correct and dated by the Mother only, on June 23, 1995.

As the Debtor points out, it is not clear when she dated this latter form; she credibly denied that she saw her annual income figure of $12,480 printed inconspicuously on the dated page when she signed it. Furthermore, the Debtor was not likely to have been attempting any deception through this Form because she verified her annual income at $30,264 on March 22, 1995. It should be noted that none of the forms are particularly clear in describing their contents or significance.

The Plaintiff argued that the Debtor verified her weekly income at $160, as recited on undated Occupancy List apparently filled out in 1994. However, this form was not filled out by the Debtor and the undated signed sheet which the Plaintiff submitted as written verification of the contents of the Occupancy List was in fact a release of information form, not a certification or verification of the accuracy of the contents of the Occupancy List.

We therefore cannot find proof in this record that the Debtor made any misrepresentations to the Plaintiff. It therefore follows that the Plaintiff has not proven that any misrepresentations of the Debtor were proven to have been knowingly false

or made with the intention and purpose of deceiving the Plaintiff. See In re Ciambrello, 1999 WL 1212179, at *4, Bankr. No. 99–16670DAS, Adv. No. 99–0569, slip op. at 10–11 (Bankr.E.D.Pa. Dec. 15, 1999); and In re Bulei, 1995 WL 431297, at *4 (Bankr.E.D.Pa. July 20, 1995) (if the first of the five § 523(a)(2)(A) elements cannot be proven, neither can most of the other elements of such a claim be proven).

The Plaintiff is also unable to prove the fifth § 523(a)(2)(A) element. Having failed to prove a false representations on the part of the Debtor, it follows that the Plaintiff is unable to prove that any such representation on the part of the Debtor caused it any loses or damages. Furthermore, the proof of any damages to the Plaintiff as a result of the inaccurate representations of the income of the Debtor's household is uncertain. It is not clear when, if ever, and how HUD would undertake to recoup its excessive HAPs from the Plaintiff. It is clear that, although it has been over four years after the last of the misrepresentations at issue were made, the Plaintiff has not yet been charged for same by HUD. These facts raise at least a question as to whether the Plaintiff will ever be required to bear this cost, and hence will ever suffer any actual damages as a result of HUD's excessive HAPs to the Debtor's household.

For the foregoing reasons, we therefore must reject the Plaintiff's claims against the Defendant based upon 11 U.S.C. § 523(a)(2)(A).

3. *The Plaintiff Failed to Prove that the Debtor Issued Any Written Statement of Her Financial Condition to It Such As Would Give Rise to a Claim Under § 523(a)(2)(B).*

■ Code section § 523(a)(2)(B) recites four elements, all of which must be proven to sustain a claim under that Section, in its text. See page 288 *supra.* Again, except for the reliance element set forth in § 523(a)(2)(B)(iii), the Plaintiff is hard-

pressed to prove any of the necessary elements of the claim, nor is it able to establish the apparent additional requirement of showing losses or damages proximately caused by the Debtor's actions.

■ The threshold requirement of § 523(a)(2)(B) is a showing that the Debtor issued a statement in writing misrepresenting her financial condition. The Plaintiff contended that the verification forms meet this requirement because, while they did accurately disclose certain of her employment, they did not accurately disclose all of her various employers, including the principal ones. However, the forms referenced contained no certifications that they included reference to all or other employment of the Debtor, but simply that the particular employment stated was accurate.

That leaves only the Debtor's alleged verification of the 1994 Occupancy List, the accurate Asset Information certification, and the alleged verification of the June 23, 1995, 50095 Form as potential § 523(a)(2)(B) statements of the Debtor's financial condition. However, there is no evidence that the alleged certifications were in fact included with the Occupancy List and 50095 Form, respectively, and hence that the Debtor was in fact certifying their contents when she signed them.

In any event, it appears a stretch to characterize any of these forms as statements of the Debtor's financial condition for purposes of § 523(a)(2)(B). As the court states in *In re Pollina,* 31 B.R. 975, 978 (D.N.J.1983),

> [t]he term "financial statement" is not defined in 11 U.S.C. § 101. In ordinary usage it would certainly include the typical balance sheet (assets and liabilities) and profit and loss statement in a business context. It may well apply to an indication of "net worth."

*See also In re Sansoucy,* 136 B.R. 20, 23 (Bankr.D.N.H.1992) (follows *Pollina* ); *In re Seaborne,* 106 B.R. 711, 714 (Bankr. M.D.Fla.1989) ("Section 523(a)(2)(B) is

meant to pertain to a specific type of financial statement, one that specifically state a debtor's or insider's net worth."); and *In re Turner,* 23 B.R. 681, 685 (Bankr. D.Mass.1982) ("To satisfy the false financial statement exception, there must exist a written statement which represents the debtor's financial condition containing some type of statement valuing assets and/or liabilities.").

■ It is logical to require that a degree of completeness and formality accompany a document the inaccuracy of which can itself trigger nondischargeability. Except for perhaps the June 23, 1995, 50095 Form, which the Debtor did not sign and testified that she did not review, the documents at issue lack sufficient comprehensiveness to constitute financial statements. They do not purport to be balance sheets or include valuations of all of the Debtor's assets and liabilities. They are more like checks, *see, e.g., In re Lahiri,* 225 B.R. 582, 589–90 (Bankr.E.D.Pa.1998); forms, *In re Bonefas,* 41 B.R. 74, 78 (Bankr. N.D.Iowa 1981); or applications, *In re O'Brien,* 110 B.R. 27, 30 (Bankr.D.Colo. 1990), which do not rise to the level of § 523(a)(2)(B) financial statements.

■ As to the June 23, 1995, 50095 Form and alleged accompanying certification, there exists, as the Debtor suggests, an issue regarding the reasonability of the Plaintiff's reliance thereupon, assuming that proof of any reliance at all could be deduced in the absence of Canteen's testimony addressing this point. The Debtor had dated, on the face of same, a March 22, 1995, 50095 Form accurately stating her income as $30,264. As the court holds in *In re Cohn,* 54 F.3d 1108, 1117 (3d Cir.1995),

> [a] determination of reasonable reliance requires consideration of three factors: (1) the creditor's standard practices in evaluating credit-worthiness (absent other factors, there is reasonable reliance where the creditor follows its normal business practice); (2) the standards or customs of the creditor's

industry in evaluating credit-worthiness (what is considered a commercially reasonable investigation of the information supplied by· debtor); and (3) the surrounding circumstances existing at the time of the debtor's application for credit (whether there existed a "red flag" that would have alerted an ordinarily prudent lender to the possibility that the information is inaccurate, whether there existed previous business dealings that gave rise to a relationship of trust, or whether even minimal investigation would have revealed the inaccuracy of the debtor's representations). *See Coston v. Bank of Malvern (In re Coston )*, 991 F.2d 257, 261 (5th Cir. 1993) (en banc); *[In re] Mitchell,* 70 B.R. [524,] at 527–28 [(Bankr.N.D.Ill. 1987)]; *[In re] Martz,* 88 B.R. [663,] at 673–74 [(Bankr.E.D.Pa.1988)].

The Plaintiff presented no evidence regarding its standards or those in the industry where a party situated similarly to Canteen had received a 50095 Form inconsistent with one filed three months before. However, when the later statement recited a dramatic reduction in income as compared to the previous statement and the certification in the later document is made by a member of a household the accuracy of whose income reports is under investigation, it would certainly appear that a "red flag" would have gone up in the mind of Canteen which would have precluded his reliance on the later statement.

Assuming that any of the documents at issue were established to be § 523(a)(2)(B) financial statements on which the Plaintiff reasonably relied, proof of the additional elements of the Debtor's making this publication with intent to deceive confronts the Plaintiff. ˙ Our analysis of the Plaintiff's § 523(a)(2)(A) claims, at pages 289–90 *supra,* indicates that we would be unable to find this element present as to any of the publications at issue.

Finally, we note a split in the caselaw as to whether a § 523(a)(2)(B) plaintiff need prove the element of loss and damage as the proximate result of the debtor's presentation of a false financial statement to the plaintiff. *Compare In re Campbell,* 159 F.3d 963, 966 (6th Cir.1998); *In re McFarland,* 84 F.3d 943, 947 (7th Cir. 1996); *In re Norris,* 70 F.3d 27, 29 n. 6 (5th Cir.1995); *In re Goodrich,* 999 F.2d 22, 26 (1st Cir.1993); and *In re Priestley,* 201 B.R. 875, 885 (Bankr.D.Del.1996) (no proximate cause of damage requirement exists), *with In re Siriani,* 967 F.2d 302, 304 & n. 2 (9th Cir.1992); *In re Freeman,* 142 B.R. 758, 761–62 (Bankr.E.D.Va.1991); *In re Hall,* 109 B.R. 149, 153 (Bankr. W.D.Pa.1990); *In re Anzman,* 73 B.R. 156, 165 (Bankr.D.Colo.1986); and *In re Long,* 44 B.R. 300, 309–10 (Bankr.D.Minn.1983), *aff'd,* 774 F.2d 875 (8th Cir.1985) (proximate cause of damages must be proven).

Despite the weight of appellate authority on the "no damage needed" side, we believe that the cases requiring proof of damages are correct. As *Field* teaches, § 523(a)(2) requirements must be determined under common law tort principles. For this reason, a damage requirement is uniformly read into § 523(a)(2)(A), even though no express inclusion of such a requirement appears in the text of that Code section. We attribute the presence of the requirement that "resulting injury" proximately caused by alleged fraudulent conduct is included as a requirement in a § 523(a)(2)(A) claim to the fact that this is an element which is necessary for the proof of common law fraud generally. *See In re Orthopedic Bone Screw Products Liability Litigation,* 159 F.3d 817, 822 (3d Cir.1998); and *In re Wright,* 223 B.R. 886, 896 (Bankr.E.D.Pa.1998). We can conceive of no reason why the common law requirement of proof of resulting injury as the proximate cause as a necessary element of a successful fraud claim should not carry over to § 523(a)(2)(B) as well as to § 523(a)(2)(A).

As we indicated at page 290 *supra,* we find the Plaintiff's proof of its having suffered any actual damages as a

proximate cause of the Debtor's actions deficient. For this reason also, the Plaintiff's § 523(a)(2)(B) claim cannot be sustained.

4. *The Plaintiff Failed to Prove that the Debtor Incurred Any Obligation to It Through the Abuse of a Fiduciary Relationship.*

Finally, the Plaintiff contends that the Debtor should be denied a discharge of any indebtednesses which she has to the Plaintiff because she committed fraud or defalcation while acting in a fiduciary capacity as a member of the Plaintiff's Board of Directors and Treasurer of that Board.

■ In order to prove in a claim under the "fiduciary capacity" prong of § 523(a)(4), the Plaintiff is first obliged to establish that the Debtor acted as its fiduciary when serving as a corporate director and officer. As the Debtor correctly points out in her brief, the Plaintiff "elides over" the fact that, while it seeks to utilize this basis to declare the Debtor's entire alleged obligation dischargeable, accrued between 1990 and 1995, the Debtor was indisputably *not* a director or officer of the Plaintiff prior to 1994. However, it is clear that the fiduciary relationship serving as the bases of a § 523(a)(4) claim "must precede the bad acts in question." *In re Selmonosky*, 204 B.R. 820, 828 (Bankr.N.D.Ga.1996). *Accord, In re Hogan*, 193 B.R. 130, 138 (Bankr.N.D.N.Y. 1995); *In re Garver*, 180 B.R. 181, 185 (Bankr.N.D.Ohio 1995); and *In re Janikowski*, 60 B.R. 784, 788 (Bankr.N.D.Ill. 1986). The foregoing principle confines the Plaintiff's § 523(a)(4) claims to frauds or defalcations arising in 1994 or 1995.

■ A further issue, to which the parties devote most of their attention, is whether a corporate director or officer, while undoubtedly a "fiduciary" of that corporation in a broad sense, *see, e.g.,* 15 Pa.C.S. § 5712(a); *Brown v. Presbyterian Ministers Fund*, 484 F.2d 998, 1005 (3d Cir.1973); and *In re Main, Inc.*, 1999 WL

424296, at *14–*15 (E.D.Pa. June 23, 1999), qualifies as a § 523(a)(4) fiduciary. As we have held, most recently in *In re Desiderio*, 213 B.R. 99, 102–03 (Bankr. E.D.Pa.1997),

[i]t is well-established in the caselaw interpreting the § 523(a)(4) defalcation prong, as stated by this court in *In re Kaplan*, 162 B.R. 684, 704 (Bankr. E.D.Pa.1993), *aff'd sub nom. Kaplan v. First Options of Chicago, Inc.*, 189 B.R. 882 (E.D.Pa.), *reconsideration denied sub nom. First Options of Chicago, Inc. v. Kaplan*, 198 B.R. 91 (E.D.Pa. 1996), that the term "fiduciary capacity" is very narrowly defined. Thus, we stated, at *id.*, that,

"To give rise to § 523(a)(4) liability, it is not sufficient for the plaintiff to prove only that there was a fiduciary relationship between the parties, but also to prove that there is an express trust held by the fiduciary (debtor) on behalf of the beneficiary (creditor), which did not arise out of the action that created the fiduciary relationship. *See In re Spector*, 133 B.R. 733, 739–40 (Bankr.E.D.Pa.1991) (holding that the 'fraud or defalcation' prong of § 523(a)(4) requires the showing of an express trust); *In re Shervin*, 112 B.R. 724, 730–31 (Bankr.E.D.Pa.1990); and *In re Snyder*, 101 B.R. 822, 835 (Bankr.D.Mass.1989), *aff'd in part & rev'd in part on other grounds sub nom. Snyder v. Bornstein*, 923 F.2d 840 (1st Cir.1990)."

In order to establish the requisite "express trust," we stated in *Kaplan* that the § 523(a)(4) plaintiff is required to prove the presence of

"[t]he prerequisites for the creation of an express trust relationship under Pennsylvania law [which] are, as we thusly held in *In re Kulzer Roofing, Inc.*, 139 B.R. 132, 139–40 (Bankr. E.D.Pa.), aff'd, 150 B.R. 134 (E.D.Pa. 1992), quite d demanding:

'The elements of an express trust, as developed by Pennsylvania case

law, are (1) an express intent to create a trust; (2) an ascertainable res; (3) a sufficiently certain beneficiary; and (4) a trustee who "owns" and administers the res for the benefit of another (the beneficiary). *See In re Penn Central Transportation Co.,* 486 F.2d 519, 524 (3d Cir. 1973), cert. denied sub nom. *Baker v. Indiana H.B. R.R.,* 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974) ("Penn Central I"); *Sherwin [v. Oil City Nat'l Bank,]* 229 F.2d [835] 838, 839 [ (3rd Cir.1956) ]; *In re I.D. Craig Service Corp.,* 125 B.R. 453, 456 (Bankr.W.D.Pa.1991); *In re CS Associates,* 121 B.R. 942, 959 (Bankr.E.D.Pa.1990); *In re Sherwin,* 112 B.R. 724, 734 (Bankr. E.D.Pa.1990); and *Presbytery of Beaver-Butler United Presbyterian Church v. Middlesex Presbyterian Church,* 507 Pa. 255, 268–69, 489 A.2d 1317, 1324, cert. denied, 474 U.S. 887, 106 S.Ct. 198, 88 L.Ed.2d 167 (1985) . . . .the absence of any of the express trust elements to be present is fatal to the contention that a trust exists, . . .'

*See also, e.g., Thompson's Will,* 416 Pa. 249, 254–55, 206 A.2d 21, 25 (1965)."

*Id.* at 705. *See also, e.g., In re Librandi,* 183 B.R. 379, 382–86 (M.D.Pa.1995); and *In re Napoli,* 82 B.R. 378, 381–82 (Bankr.E.D.Pa.1988).

The vast majority of cases, most of which do not appear to apply the stringent test set forth in *Desiderio,* hold that corporate directors and officers are § 523(a)(4) fiduciaries of their corporations. *See, e.g., Medus v. Perry,* 171 B.R. 961, 967–70 (E.D.La.1994); *In re Decker,* 36 B.R. 452, 457 (D.N.D.1983); *In re Luppino,* 221 B.R. 693, 699 (Bankr.S.D.N.Y.1998); *In re Sullivan,* 217 B.R. 670, 676 (Bankr.D.Mass. 1998); *In re Black,* 179 B.R. 509, 514 (Bankr.E.D.Tex.1995); *In re Cummins,* 166 B.R. 338, 354–55 (Bankr.W.D.Ark. 1994); *In re Galbreath,* 112 B.R. 892, 899–900 (Bankr.S.D.Ohio 1990); *In re Snyder,* 101 B.R. 822, 831–35 (Bankr.D.Mass.1989), aff'd in part & rev'd in part on other grounds sub nom. *Snyder v. Bornstein,* 923 F.2d 840 (1st Cir.1990); *In re Anderson,* 64 B.R. 331, 334 (Bankr.N.D.Ill. 1986); and *In re Cowley,* 35 B.R. 526, 529 (Bankr.D.Kan.1983). To the contrary are only a few cases, *e.g., In re Long,* 774 F.2d 875, 878–79 (8th Cir.1985); and *In re Frain,* 222 B.R. 835, 837–38 (Bankr. N.D.Ill.1998).

Despite this weight of authority in favor of our finding a § 523(a)(4) fiduciary relationship in these circumstances, we find it hard to agree that the general requirements of § 523(a)(4) fiduciary relationship, as set forth in *Desiderio* and the cases cited by it, in fact exist by reason of the mere existence of a director-officer/corporation relationship. This relationship does not typically contemplate a situation whereby the corporation is the beneficiary of a trust of which the officer-director is deemed a trustee. Moreover, while such a characterization might accurately describe the relationship of a controlling director or officer of a corporation, it seems ill-fitted to the instant relationship between the Debtor and the Plaintiff. The Debtor credibly testified that she was a director and officer by default of interest in the position by other tenants and exercised no supervisory powers nor special rights as the result of her positions.

However, assuming *arguendo* that we found the Debtor to be in any sense a § 523(a)(4) fiduciary of the Plaintiff at any time, we note that

Congress designed the [§ 523(a)(4) fiduciary duty] discharge exception to reach "debts incurred through abuses of fiduciary positions and through active misconduct whereby a debtor has deprived others of their property by criminal acts; both classes of conduct involve debts arising from the debtor's acquisition or use of property that is not the debtor's."

*In re Tran*, 151 F.3d 339, 342 (5th Cir. 1998), quoting *In re Boyle*, 819 F.2d 583, 587–88 (5th Cir.1987). Thus, a § 523(a)(4) fraud or defalcation must arise "in relation to the debtor's fiduciary responsibilities." *In re Bugna*, 33 F.3d 1054, 1057 (9th Cir. 1994), citing *In re Teichman*, 774 F.2d 1395, 1398 (9th Cir.1985). *See also In re Hatley*, 227 B.R. 757, 760 (10th Cir. BAP 1998) ("fraud or defalcation [must be] committed by the debtor in the course of that fiduciary relationship."); *In re Rosen*, 232 B.R. 284, 296 (Bankr.E.D.N.Y.1999); *In re Coleman*, 231 B.R. 393, 395 (Bankr.S.D.Ga. 1999); and *In re Allen*, 206 B.R. 602, 606 (Bankr.M.D.Fla.1997).

According to the Debtor's credible and unrebutted testimony, her fiduciary duties for the Plaintiff were confined to providing checks to the corporate President to sign. There is no indication that the Board, or the Debtor as a board member, ever became involved in the HAP income-certification process. Therefore, the Debtor's actions in her capacity as a income-earning member of the household of a tenant of the Plaintiff did not arise in the course of or in relation to her fiduciary responsibilities. There is no evidence that the Debtor abused her director or officer positions in the reporting of her household's income. Therefore, the instant facts do not support a claim under the § 523(a)(4) fiduciary capacity prong against the Debtor.

Finally, we note that the common law fraud requirement of damages proximately caused by the Debtor's actions would apparently carry over to the Plaintiff's § 523(a)(4) claims as well. Again, the doubtful proof of its actual damages as a result of the inaccurate reporting of the income of the Debtor's household to the Plaintiff could in itself be found to bar this claim, as in the case of its § 523(a)(2) claims. *See* page 290 *supra*.

## D. CONCLUSION

Since none of the Plaintiff's claim can be sustained, we will proceed to enter or order declaring the Debtor's obligations to the Plaintiff dischargeable.